STATE OF NORTH CAROLINA v. ANTHONY DALE FIELDS

No. 653A84

(Filed 10 December 1985)

**1. Burglary and Unlawful Breakings § 3.1— tool shed—not within curtilage—indictment for burglary should have been quashed**

An indictment for second degree burglary that specified that defendant broke and entered an unoccupied tool shed at nighttime with felonious intent should have been quashed, and convictions for second degree burglary and felony murder committed during the burglary could not stand, where the shed contained house tools, garden equipment, non-perishable food, and a freezer; was located forty-five feet from the dwelling; and was not within the curtilage of the dwelling house. The visual and auditory proximity of outbuildings that serve the comfort and convenience of the homeowner is a useful theoretical measure of whether those buildings lie within or beyond the curtilage; an outbuilding used to house and secure tools and other items of personal property does not immediately serve the comfort and convenience of those who inhabit the dwelling house.

**2. Homicide § 4.2— felony murder—larceny interrupted**

A homicide victim's death occurred during the perpetration of a larceny, not after its completion, where defendant and his companions had entered a storage shed and removed a chain saw and maul and were checking to see if the house was occupied when the victim approached to investigate. The killing resulted from and was the culmination of defendant's course of conduct.

**3. Homicide § 4.2— weapon carried but not used in underlying burglary and larceny—evidence sufficient**

A killing was effected during the perpetration of a felony committed with the use of a deadly weapon within the definition of N.C.G.S. 14-17 where defendant carried a gun during the commission of a larceny but did not use it to commit the larceny. Possession is enough; moreover, the victim's arrival was an interruption of the larceny, not an event marking its completion, and killing the victim was clearly part of defendant's attempt to escape apprehension for the breaking and entering and theft from the tool shed.

**4. Homicide § 18.1— murder during larceny—evidence of premeditation sufficient**

The evidence supported defendant's conviction for first degree murder based on premeditation where defendant and his companions entered a tool shed and were examining the house to see if it was vacant when the victim approached with a shotgun to investigate; the victim's conduct was not so threatening as to cause defendant and his companions to fear for their lives or to otherwise provoke them; the fact that defendant was even carrying a gun was conduct preceding the murder that evinced defendant's anticipation of a possible confrontation and some forethought of how he would deal with it; once warned of the victim's approach by a companion, defendant had ample time and opportunity to formulate an intent to kill the victim; defendant did not

shoot the victim immediately, but waited until the victim turned his head; defendant took advantage of the victim's diminished vigilance to draw his own gun and to warn him to "Hold it"; defendant shot the victim as he turned around; the victim fell to the ground and dropped his shotgun after the first shot hit him; defendant fired four more times, three times into the victim's body; and defendant had the presence of mind after the murder to take the victim's gun, agree with the others to keep silent, and later to have the murder weapon melted down.

**5. Robbery § 4.3— armed robbery—victim dead—use of force in theft—single transaction—evidence sufficient**

The evidence was sufficient to support a conviction for armed robbery where defendant took the shotgun the victim had been carrying after killing the victim. When the circumstances of the alleged armed robbery reveal that defendant intended to permanently deprive the owner of his property and the taking was effectuated by the use of a dangerous weapon, it makes no difference whether the intent to steal was formulated before the use of force or after it, so long as the theft and the use or threat of force could be perceived by the jury as constituting a single transaction. N.C.G.S. 14-87.

**6. Criminal Law § 89; Witnesses § 1.3— State's witnesses abusers of alcohol and drugs—testimony admissible**

The trial court did not err in a prosecution for murder, robbery, larceny, and burglary by admitting the testimony of defendant's two companions, who were abusers of alcohol and hallucinogenic and psychotropic drugs and who had been impaired by drugs and alcohol on the night in question. A witness is not incompetent to testify on the basis of drug use alone, and the ability of these witnesses to communicate appeared generally adequate; moreover, the trial court's determination that a witness is competent to testify is with good reason within the discretion of that court. N.C.G.S. 8C-1, Rule 601(b) (Cum. Supp. 1985).

**7. Criminal Law § 86.9— impeachment by State of its own witness—questions designed to clarify testimony—no error**

In a prosecution for robbery, burglary, larceny, and murder which arose from defendant's shooting of a neighbor who came to investigate with a shotgun after defendant and his companions broke into a tool shed, the court did not err by allowing the State on redirect examination to impeach one of defendant's companions who was testifying for the State. Defense counsel had elicited a broad statement from the witness that he had been scared and shocked, and the State's purpose was to identify more precisely that moment at which the witness was afraid for his life rather than to impeach his cross-examination testimony.

**8. Criminal Law §§ 124.4, 135.4— murder—verdict based on four theories—jury not required to rank theories**

In a prosecution in which defendant was found guilty of first degree murder based on malice, premeditation and deliberation, murder committed during the perpetration of a burglary, murder committed during the perpetration of felonious breaking or entering, and murder committed during the

perpetration of felonious larceny, the Supreme Court declined to initiate a rule requiring the jury to rank the theories upon which its murder verdict rested.

APPEAL by defendant from judgments entered by *Lee, J.*, at the 14 May 1984 session of Superior Court, WAKE County. Heard in the Supreme Court 14 October 1985.

On 21 February 1983, defendant, Anthony Dale Fields, and his two companions, Norman David Collins, Jr., and Douglas Glenn Boney, having consumed quantities of beer and Quaaludes, took a drive around Wake County in defendant's truck. At approximately 8:30 p.m., they entered the driveway of Ernest Carter. Defendant and Boney slid open the door of a storage shed located some forty-five feet from the Carter house and removed a chain saw and maul. Collins was knocking on the doors and looking into the windows of the Carter home to determine whether anyone was there. Meanwhile, Samuel McBridge Fisher, Jr., who lived next door to the Carters and who knew the Carters not to be at home, had seen defendant's truck enter the Carter property. He took his single-shot, 12-gauge shotgun and drove down the Carter driveway to investigate.

When Collins saw Fisher's truck approaching, he shouted a warning to the other two, who threw the chain saw and maul into the bushes and their gloves into defendant's truck. Fisher approached the three with the gun under his arm and ordered them to get up against his truck with their hands up. When they had done so, Fisher turned away from them to look towards the Carter house. Defendant, drawing a .38-caliber pistol from his waistband, told Fisher to "Hold it." Fisher turned back around and was immediately shot five times by defendant. Defendant grabbed Fisher's shotgun, which had fallen from Fisher's hands after the first shot had hit him, put it in the bed of his truck, hurriedly got in the cab with his companions, and drove off. Fisher died as a result of his wounds.

*Lacy H. Thornburg, Attorney General, by Christopher P. Brewer, Assistant Attorney General, for the state.*

*Robert A. Hassell for defendant.*

MARTIN, Justice.

Defendant presents this Court with nine arguments. The first six of these challenge the sufficiency of the evidence supporting defendant's convictions for armed robbery, murder in the first degree on the theories of premeditated and deliberate murder, felony murder based on felonious breaking or entering, larceny, and burglary in the second degree. Defendant's remaining arguments concern evidentiary and sentencing issues. We find that the trial court erred only in refusing to quash the indictment for burglary in the second degree and in denying defendant's motion to dismiss that charge. All other assignments of error we find to be without merit.

I. ·

[1] Defendant first challenges the indictment and charge of burglary in the second degree. He contends that a shed that houses tools, garden equipment, nonperishable food, and a freezer and that is located at least forty-five feet from the dwelling is not within the curtilage of the dwelling house. We find that, under the facts of this case, defendant's point is well taken: the shed from which he and his companions stole a chain saw and splitting maul was not within the curtilage of the dwelling and therefore was not protected by the burglary statute, N.C.G.S. 14-51.

The curtilage is the land around a dwelling house upon which those outbuildings lie that are "commonly used with the dwelling house." *State v. Twitty*, 2 N.C. 102 (1794). Differentiating buildings that lie within the curtilage, which can be burglarized, from those outside it, which cannot, has been a troublesome exercise for the courts, one which is necessarily repeated with each case like the one before us. However, with each iteration of the exercise, two themes consistently emerge: the function of the building and its proximity to the dwelling house.

Under common law, houses or buildings within the curtilage that were used as part of the dwelling, such as smokehouses and pantries, were protected by the prohibition against burglary. *State v. Foster*, 129 N.C. 704 (1901). The question whether a building was part of the dwelling rested upon whether it served the "comfort and convenience" of the dwelling.

But the law throws her mantle around the dwelling of man, because it is the place of his repose, and protects not only

the house in which he sleeps, but also all others appurtenant thereto, as parcel or parts thereof, from meditated harm; thus the kitchen, the laundry, the meat or smoke house, and the dairy are within its protection; for they are all used as parts of one whole, each contributing in its way to the comfort and convenience of the place as a mansion or dwelling.

*State v. Langford*, 12 N.C. 253, 253-54 (1827).

The curtilage test rested not merely upon the building's use, but upon its convenience. Thus proximity was a second, supplementary[1] guide to whether the protection of the burglary law extended to a particular building. If a building, even one that served the daily needs of the homeowner, was so distant from the dwelling house that an intrusion did not disturb the repose of those in the dwelling house, then that intrusion was not burglary.

[T]he law protects from unauthorized violence the dwelling-house and those which are appurtenant, because it is the place of the owner's *repose*; and if he choose to put his kitchen or smokehouse so far from his dwelling that his *repose* is not likely to be disturbed by the breaking into it at night, it is his own folly.

*State v. Jake*, 60 N.C. 471, 473 (1864).

In 1889 the burglary law was modified to provide that it was burglary in the second degree to commit the crime in an unoccupied dwelling house or a building within its curtilage or in any other unoccupied building with a sleeping compartment. Because, under these circumstances, none was present to hear the entry, the potential for disturbed repose as a measure of appurtenance survived only in the abstract. Nevertheless, the visual and auditory proximity of outbuildings that serve the comfort and convenience of the homeowner is still a useful theoretical measure of whether those buildings lie within or beyond the curtilage.

Applying this theoretical yardstick to the facts of this case, it is clear that the outbuilding "used to house and secure tools and

---

1. The Court in *Langford* recognized that distance alone was an unsatisfactory test: "Must the off-house be within one foot, ten, or a hundred feet? Or, as some say, a bow's shot? Those who speak of distance ascertain it only by its being reasonable, and what may be reasonable to the mind of one man may not be to that of another." 12 N.C. at 254.

other items of personal property," as specified in the burglary indictment of defendant, does not immediately serve the comfort and convenience of those who inhabit the dwelling house.[2]

It is well to remember that the law of burglary is to protect people, not property. If the intrusion is into a place where people are present,[3] then burglary in the first degree has been committed. If the intrusion is into a place where it is likely that the repose of one of the household would be disturbed if one were present (but is not), then burglary in the second degree has been committed. The indictment for burglary in the second degree that specified that defendant broke into and entered an unoccupied toolshed at nighttime with felonious intent was defective and should have been quashed. Likewise, the trial court was remiss in not dismissing charges of burglary in the second degree based upon that indictment. We accordingly arrest the judgment upon the conviction of burglary in the second degree.

In addition, because defendant's conviction for burglary in the second degree cannot stand, we likewise vacate defendant's conviction for felony murder committed during the perpetration of that felony.

## II.

[2] Defendant takes two lines of attack on his convictions of felony murder based upon being committed in the perpetration of felonious breaking or entering and felonious larceny with the use of a deadly weapon. First, defendant insists that Fisher's death did not occur during the perpetration of the larceny, but after its

---

2. The evidence indicated that the building also contained a freezer and nonperishable foodstuffs. Although it could be argued that a building containing such provisions is a pantry, not a tool or garden shed, this is not how the building was described in the indictment. Even if the indictment had been so specific, the shed's lack of proximity to the dwelling house indicates that its contents were not indispensable to the comfort and convenience of the dwelling.

3. At common law, a building where the homeowner's servants habitually slept, as well as the house where he and his family slept, was protected by the law. But if the building housed a reposing watchman, whose job was solely to protect property, "then the house cannot be treated as a dwelling-house, and to break into it in the night-time with a felonious purpose would not be burglary." *State v. Williams*, 90 N.C. 724, 729 (1884). *Accord State v. Potts*, 75 N.C. 128, 131 (1876); *State v. Outlaw*, 72 N.C. 598, 602 (1875).

completion. Second, he suggests that if a deadly weapon is not actually used to effectuate the underlying felony, then the state cannot rely upon its mere presence in order to invoke the felony murder rule. We find neither argument persuasive.

Defendant contends that by the time Fisher arrived on the Carter property, defendant and his companions had ceased all criminal activity, including the larceny of the chain saw and maul. The test for whether the felony and the murder are so connected as to invoke the felony murder rule was articulated by this Court in *State v. Hutchins*, 303 N.C. 321, 345, 279 S.E. 2d 788, 803 (1981):

> A killing is committed in the perpetration or attempted perpetration of a felony for purposes of the felony murder rule where there is no break in the chain of events leading from the initial felony to the act causing death, so that the homicide is part of a series of incidents which form one continuous transaction.

If Fisher's being shot had been an isolated event, one unrelated to the thefts from the toolshed or to the aborted inspection of the Carter home by defendant's companion Collins or to Fisher's apprehension of defendant and the others, then the killing could not be felony murder. But the time, place and cause of the shooting were all well within the scope of the larceny. The interconnectedness of events, indeed even their causal interrelationship, is obvious. We are as incredulous as Fisher himself apparently was of defendant's protestation that he and the others had just abandoned their felonious activities *coincidentally* the very moment Fisher arrived on Carter property.

The similarity of the facts in *State v. Thompson*, 280 N.C. 202, 185 S.E. 2d 666 (1972), *superseded on other grounds by statute*, and *State v. Davis*, 305 N.C. 400, 290 S.E. 2d 574 (1982), to those in the case now before us is illuminating on this point. In *Thompson*, one accomplice had already left with some stolen goods, and the other left after the defendant told him that he had everything he wanted. The defendant then went back upstairs and shot the victim. This Court determined that, under such circumstances, "the killing resulted from and was the culmination of defendant's course of criminal conduct while engaged in the perpetration of felonious breaking and entering and felonious larceny." 280 N.C. at 213, 185 S.E. 2d at 673. The events in the case

at bar are even more contiguous than those in *Thompson*. Fisher's arrival can be viewed as a break in the chain of events only insofar as his arrival interrupted the commission of felonies that, up until that moment, had been ongoing. Like the *Thompson* Court, we are convinced that the killing in this case resulted from and was the culmination of defendant's course of criminal conduct.

[3] Defendant's second point of contention concerning the charges of felony murder raises a question of first impression for this Court about a statutory modification to the felony murder portion of the homicide statute. N.C.G.S. 14-17 now reads, in pertinent part: "A murder which shall be . . . committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, *or other felony committed or attempted with the use of a deadly weapon* shall be deemed to be murder in the first degree . . . ." (Emphasis added.) The requirement that the use of a deadly weapon distinguished the commission or attempted commission of an unspecified or "other" felony was added to this statute by amendment in 1977. Defendant argues that this language requires the felony underlying the felony murder charge actually to be *effectuated* with the use of a deadly weapon, and that it is not enough merely to possess such a weapon during the commission of the felony. We find that not only do the facts of this case not support such a proposition, but the proposition itself is more restrictive than the legislature intended in amending the "other felony" phrase, and we reject the argument.

In *State v. Davis*, 305 N.C. 400, 290 S.E. 2d 574, this Court surmised that the amendment to the unspecified, "other felony" phrase was a response to holdings such as that in *State v. Streeton*, 231 N.C. 301, 56 S.E. 2d 649 (1949), in which this Court interpreted "any other felony" to mean "any other felony inherently dangerous to human life." 231 N.C. at 305, 56 S.E. 2d at 652. The *Davis* Court also cited *Thompson*, 280 N.C. 202, 185 S.E. 2d 666, in which a formula for "other felony" even broader than the "inherently dangerous" classification in *Streeton* was articulated:

> In our view, and we so hold, any unspecified felony is within the purview of G.S. 14-17 if the commission or attempted commission thereof creates any *substantial foreseeable human risk* and actually results in the loss of life. This in-

cludes, but is not limited to, felonies which are inherently dangerous to life.

280 N.C. at 211, 185 S.E. 2d at 672 (emphasis added). The *Davis* Court stated that holdings concerning the pre-1977 phrase such as those is *Streeton* and *Thompson* "should be disregarded on this point involving murders committed after that date." *Davis*, 305 N.C. at 423, 290 S.E. 2d at 588.

Under the amended statute, where the perpetrator of such felony carries a deadly weapon, the balance is tipped: the simple fact that the felon has a weapon in his possession creates a substantial, foreseeable human risk. Thus, in the case before us, defendant's carrying a gun in the course of the felonious larceny would have satisfied the more vague, pre-1977 requisite for the dangerous nature of the unspecified felony. The question now before us is to what extent the legislature, by tightening the definition for unspecified felonies, has shifted the meaning from a risky or dangerous felony to a definition requiring the actual *use* of a deadly weapon in the commission or attempted commission of the felony. If one carries a gun throughout a larceny but never uses it to break a latch, for example, or to threaten bystanders to remain at bay, and a victim dies as a result of the crime (but not necessarily by wounds inflicted by that gun), is the defendant guilty of felony murder? Does mere "possession" of the deadly weapon satisfy the "use" language of the statute?

We hold that possession is enough, and the defendant is guilty of felony murder, even if the weapon is not physically used to actually commit the felony. If the defendant has brought the weapon along, he has at least a psychological use for it: it may bolster his confidence, steel his nerve, allay fears of his apprehension. Even under circumstances where the weapon is never used, it functions as a backup, an inanimate accomplice that can cover for the defendant if he is interrupted.

And under the circumstances of this case, there is no question that the facts fit the language of the statute. Fisher's arrival was an interruption in the larceny, not an event marking its completion. Killing Fisher was clearly part of defendant's attempt to escape apprehension for the breaking and entering and the theft from the toolshed. Under these facts, defendant's use — both physical and psychological — of his gun put his actions squarely within

the definition of N.C.G.S. 14-17. We hold the killing of Fisher was effected during the perpetration of a felony committed with the use of a deadly weapon.

## III.

[4]   Defendant urges this Court to reverse his conviction for premeditated and deliberate murder in the first degree because, he asserts, the evidence shows the shooting to have been a purely instinctive reflex reaction and his motive to have been no more than self-preservation. We disagree.

"Premeditation" means that the defendant thought about killing for some length of time, however short, before he killed. *State v. Lowery*, 309 N.C. 763, 768, 309 S.E. 2d 232, 237 (1983); *State v. Corn*, 303 N.C. 293, 278 S.E. 2d 221 (1981). "Deliberation" means that the intent to kill was formulated in a "cool state of blood," one "not under the influence of a violent passion suddenly aroused by some lawful or just cause or legal provocation." *Lowery*, 309 N.C. at 768, 309 S.E. 2d at 237.

On more than one occasion this Court has enumerated several circumstances that tend to prove premeditation and deliberation. *See, e.g., State v. Hamlet*, 312 N.C. 162, 321 S.E. 2d 837 (1984); *State v. Bullard*, 312 N.C. 129, 322 S.E. 2d 370 (1984); *State v. Huffstetler*, 312 N.C. 92, 322 S.E. 2d 110 (1984). Among these are three circumstances that are directly applicable to the facts of this case: (1) lack of provocation by the deceased, (2) defendant's conduct before and after the killing, and (3) the infliction of lethal blows after the deceased has been felled and rendered helpless.

Viewed in a light most favorable to the state, the evidence before us shows that Fisher's own conduct was not so threatening as either to cause Boney and defendant to fear for their lives or otherwise to provoke them. The fact that defendant was even carrying a gun was conduct preceding Fisher's murder that evinced defendant's anticipation of a possible confrontation and some forethought of how he would deal with it. Once interrupted by Collins' warning, defendant and Boney walked from the shed to defendant's own truck, then to Fisher's. This was ample time and opportunity for defendant to formulate an intent to kill Fisher. He did not shoot Fisher immediately, but bided his time, waiting until Fisher turned away. Defendant took advantage of Fisher's

diminished vigilance to draw his own gun and to warn Fisher to "Hold it." Then, as Fisher turned around, defendant shot him. Fisher fell to the ground, dropping his shotgun after the first shot hit him, but defendant shot four more times, three times into Fisher's body. At no time does the evidence show defendant not to have been a reasoning being. He was not operating under the influence of overwhelming fear or passion, but with a cool, deliberate state of mind. Following the murder, defendant still had the presence of mind to take Fisher's gun, to agree with the others to keep silent about the affair, and later to have the murder weapon melted down.

We find the above to be evidence sufficient to sustain the jury's verdict of murder in the first degree based upon deliberation and premeditation.

IV.

[5] Defendant contends that he took Fisher's shotgun as an afterthought and that by then Fisher was already dead.[4] He argues that an intent to steal formed only after the use of force has culminated in the victim's death vitiates the charge of armed robbery and that a corpse is incapable of possessing personal property.

To accept defendant's argument would be to say that the use of force that leaves its victim alive to be dispossessed falls under N.C.G.S. 14-87, whereas the use of force that leaves him dead puts the robbery beyond the statute's reach. That the victim is already dead when his possessions are taken has not previously been an impediment in this jurisdiction to the defendant's conviction for armed robbery. *See, e.g., State v. Webb*, 309 N.C. 549, 308 S.E. 2d 252 (1983). All that is required is that the elements of armed robbery[5] occur under circumstances and in a time frame that can be

---

4. Whether Fisher was killed outright is not clear from the record. The state refers to testimony from Collins that Fisher was still alive even as defendant drove off with the others.

5. The elements of armed robbery under N.C.G.S. 14-87 are "(1) the unlawful taking or an attempt to take personal property from the person or in the presence of another (2) by the use or threatened use of a firearm or other dangerous weapon (3) whereby the life of a person is endangered or threatened." *State v. Beaty*, 306 N.C. 491, 496, 293 S.E. 2d 760, 764 (1982).

perceived as a single transaction.[6] When, as here, the death and the taking are so connected as to form a continuous chain of events, a taking from the body of the dead victim is a taking "from the person." *See* 67 Am. Jur. 2d *Robbery* § 14 at 65 (1985).

Defendant's reasoning is on no firmer ground with his belated intent argument. Not only does his intent to deprive Fisher of his gun appear to be so joined in time and circumstances with his use of force against Fisher that these elements appear inseparable, but this Court has held that mixed motives do not negate actions that point undeniably to a taking inconsistent with the owner's possessory rights.

In *State v. Smith*, 268 N.C. 167, 150 S.E. 2d 198 (1966), the defendant insisted that he had taken a rifle from his victim in self-defense, theoretically negating any intent to steal the weapon. Although the Court agreed that disarming another in self-defense with no intent to steal is not robbery, it noted that the circumstances in that case pointed at the very least to defendant's mixed motives. Even assuming that the defendant had taken the rifle "for temporary use," his later abandoning it evinced " 'such reckless exposure to loss' . . . consistent only with an intent permanently to deprive the owner of his property." *Id.* at 173, 150 S.E. 2d at 200.

Similarly, in *State v. Webb*, 309 N.C. 549, 308 S.E. 2d 252 (1983), the defendant shot and killed his victim, disposed of the body, then took the victim's car.[7] Justice Exum, speaking for this Court, said that the defendant's being "scared and confused" and his motivation to escape did not exculpate him.

> As in *Smith*, all the evidence here tends to show defendant never intended to return the car and that he took it and disposed of it under circumstances rendering it unlikely that it would ever be recovered and with indifference to the

6. In *State v. Handsome*, the defendant argued that because the victim's money was taken *after* he had been shot, the theft was not armed robbery. The Court disagreed: "The elements of violence and taking were so joined in time and circumstances in one continuous transaction amounting to armed robbery as to be inseparable." 300 N.C. 313, 318, 266 S.E. 2d 670, 674 (1980).

7. The fact that the victim was dead by the time his car was stolen did not even elicit comment from the Court.

rights of the car's owner. Therefore, even if defendant did use the car to escape the scene at a time when he was confused and scared, these facts, under *Smith*, would not exculpate him.

*Id.* at 557, 308 S.E. 2d at 257.

Whatever defendant's actual intentions were regarding Fisher's gun and whenever they were formulated was a dilemma for the jury. Nonetheless, we hold that when the circumstances of the alleged armed robbery reveal defendant intended to permanently deprive the owner of his property and the taking was effectuated by the use of a dangerous weapon, it makes no difference whether the intent to steal was formulated before the use of force or after it, so long as the theft and the use or threat of force can be perceived by the jury as constituting a single transaction.

V.

**[6]** Defendant contends it was error for the trial court to admit the testimony of defendant's companions, Boney and Collins, into evidence. Defendant asserts that because Boney and Collins were abusers of alcohol and hallucinogenic and psychotropic drugs and because they were impaired by the use of drugs and alcohol on the night in question, their testimony was inherently incredible. Defendant suggests that a combination of the "drug-damaged and deranged minds" of these witnesses plus their proclivity for self-preservation made them susceptible to permitting gaps in their memories to be supplied by interrogators. In addition, defendant opines that Boney and Collins were inherently incredible witnesses generally and that as such they were incompetent to testify. Defendant also points to arguably incoherent testimony by Boney and Collins in the record as evidence of their alleged incompetency.

Rule 601(b) of the North Carolina Rules of Evidence provides that "A person is disqualified to testify as a witness when the court determines that he is (1) incapable of expressing himself concerning the matter to be understood . . . or (2) incapable of understanding the duty of a witness to tell the truth." N.C. Gen. Stat. § 8C-1, Rule 601(b) (Cum. Supp. 1985).[8] A witness is not in-

---

8. The text of this rule is identical to that in the rules in effect at the time of defendant's trial.

competent to testify on the basis of drug use alone, but only insofar as such use affects his ability to be understood or to respect the importance of veracity. We do not consider the testimony of Boney and Collins quoted in defendant's brief or in the record as a whole to be incoherent. The ability of Boney and Collins to communicate appears generally adequate.

In addition, the trial court's determination that a witness is competent to testify is with good reason within the discretion of that court, which has the opportunity itself to observe the comportment of the witness. And where the effect of drug use is concerned, in particular, the question is more properly one of the witness's credibility, not his competence. As such, it is in the jury's province to weigh his evidence, not in the court's to bar it. *See* Annot., 65 A.L.R. 3d 705, § 2(a) (1975) (competency of witness — drug use).

Accordingly, we hold it was not error for the trial court to refuse to strike the testimony of witnesses Boney and Collins.

[7] Defendant's second argument based on the rules of evidence concerns the common law anti-impeachment rule in effect at the time of his trial, which prohibited the state from discrediting its own witness. *See, e.g., State v. Anderson*, 283 N.C. 218, 195 S.E. 2d 561 (1973); *State v. Taylor*, 88 N.C. 694 (1883). Even if defendant's argument were meritorious and this Court were to order a new trial, it would be both feasible and just to conduct that trial under the new rules,[9] not the old. Even so, having examined the bases for defendant's argument, we find it to be without merit.

On direct examination, Boney, the state's witness, was asked if, "at the time that Mr. Fisher was out there at the scene and when he was holding the shotgun," he believed himself to be in imminent danger of death or bodily harm. Boney responded that he did not.

· Later, on cross-examination, Boney was asked how he was feeling right at the moment that Fisher turned around to face Boney and defendant, his gun pointed at them, after defendant had told Fisher to "Hold it." Boney agreed that he was "scared" and "in shock" because he thought he was going to be shot.

9. *See* N.C. R. Evid. 607 (1984) and 1983 N.C. Sess. Laws ch. 701, § 3.

Subsequently, Boney was asked again by defense counsel what he thought "right at that minute" that Fisher turned back around in response to defendant's remark. Again, Boney said he was "in shock" because he thought Fisher was going to shoot them.

On redirect examination, Boney said he thought that, "whenever Dale said hold it, he was coming around with the gun so I thought he was gonna shoot." He then indicated that it had been the noise of the gun's discharge and seeing Fisher get shot that had scared and shocked him. When asked whether "up until the time that Mr. Fisher got shot, did [he] believe that anybody was gonna get shot?" he answered "No." Boney was later asked to recall a prior statement made to Lieutenant Pickett and, when his memory flagged, he was shown a portion of that statement. It indicated his earlier feeling that Fisher's intention was not to shoot but only to hold the three men and that Boney had not been afraid for his life until defendant said "hold it" and Fisher turned around.

We consider this testimony distinguishable from impeachment situations in which the testimony of the state's witness reveals prior statements to be lies or vice versa. *See, e.g., State v. Cope,* 309 N.C. 47, 305 S.E. 2d 100 (1983).[10] In the case before us, the state did not appear to be contradicting Boney's cross-examination testimony, but clarifying it. This Court has approved efforts by the state to clear up confusion as to its witness's statements. *State v. Williams,* 304 N.C. 394, 284 S.E. 2d 437 (1981); *State v. Berry,* 295 N.C. 534, 246 S.E. 2d 758 (1978). It is apparent to us that this was the state's intention here: defendant's counsel had elicited a broad statement from Boney that he had been scared and shocked, feelings that the jury might have understood him to have had throughout the entire episode after Fisher's initial apprehension of the three men. The record of cross-examination and redirect examination reveals the state's

10. In *Cope,* the procedure suggested in *State v. Pope,* 287 N.C. 505, 215 S.E. 2d 139 (1975), for invoking the "surprise" exception to the anti-impeachment rule was not followed by the state. For this reason this Court, speaking through Justice Exum, held that it was prejudicial error to permit testimony about the prior statements that contradicted the witness's testimony. Because we do not believe that Boney's prior statements differed significantly from his testimony, the surprise exception has no application to this case.

purpose was to identify more precisely that moment at which Boney was first afraid for his life.

This Court finds no irregularity in the state's use of Boney's statement to refresh his recollection. *See* 1 Brandis on North Carolina Evidence § 32 (1982). And because we perceive the intention and effect of the state's questions on redirect examination to have been not the impeachment but the clarification of testimony elicited on cross-examination, we find that the trial court did not err in ruling those questions and answers admissible.

## VI.

[8] The jury found defendant guilty of murder in the first degree based upon four theories — murder on the basis of malice, premeditation, and deliberation, murder committed during the perpetration of burglary in the second degree, murder committed during the perpetration of felonious breaking or entering, and murder committed during the perpetration of felonious larceny. Defendant urges this Court to initiate a rule that the jury must rank the theories upon which its murder verdicts rest. Thus, if the jury were to decide that murder committed during the commission of a particular felony was the primary basis for its verdict of murder in the first degree, the merger rule would automatically prevent the underlying felony even from being before the trial court during the sentencing phase of the trial.

Precedent as well as logic militate against adopting such a rule. In *State v. Silhan,* 302 N.C. 223, 275 S.E. 2d 450 (1981), this Court held that when a defendant is charged with both felony murder and premeditated and deliberate murder, but the jury returns a verdict of guilty for first degree murder without specifying upon which theory it relied, the court is to treat the verdict as a conviction for felony murder. The merger rule would then prohibit the court from considering the underlying felony in the sentencing hearing. *See also State v. McLaughlin,* 286 N.C. 597, 213 S.E. 2d 238 (1975), *death sentence vacated,* 428 U.S. 903 (1976).

In *State v. Goodman,* 298 N.C. 1, 257 S.E. 2d 569 (1979), the jury specifically found the defendant guilty of *both* premeditated and deliberate murder *and* felony murder. This Court made it clear that, when the jury's verdict *specifies both* theories in its verdict of murder in the first degree, it is the court's decision, not

that of the jury, to select the theory on which the sentence for the homicide is to be based. And where the sentence for homicide rests upon the premeditated and deliberate murder conviction, the merger rule does not apply.

> As we have already said, no merger of the felony occurs when the homicide conviction is based upon the theory of premeditation and deliberation. . . . Defendant was found guilty by virtue of premeditation and deliberation as well as by application of the felony-murder rule. Thus, the court could disregard the felony-murder basis of the homicide verdict and impose additional punishment upon defendant for the crimes of armed robbery and kidnapping.

*Id.* at 20, 257 S.E. 2d at 582 (citation omitted). There can be no question that the sentencing issue before us is governed by this Court's decision in *Goodman*.[11]

In addition, to adopt defendant's proposed rule would be to disregard the facts of this case, to vitiate the jury's determinations, and to confound the logic of the merger rule. Defendant contends that the jury must have relied more heavily upon the felony murder theory than upon a basis in premeditation and deliberation because he perceives little evidence in the record to support the latter. This notion is belied both by the actual evidence (see our discussion at III, *supra*) and by the jury's actual verdict. The jury found defendant guilty of murder based upon four theories. It did not determine that defendant was any more or less guilty of murder on the basis of one theory than on the basis of another, nor was it the jury's duty to make such distinctions. Where the evidence is sufficient to support such verdicts, the trial court should perceive them as being equally ranked for sentencing purposes, except for the application of such rules of law as the merger rule.

---

11. Defendant argues that an extended colloquy in *Goodman* between the court and the jury foreman, by which the court clarified the fact that the jury found Goodman guilty of murder in the first degree under both the felony murder and the premeditation and deliberation theories of law, distinguishes that case from the one before us. We disagree. No such quizzing was necessary in this case. In *Goodman*, the jury initially gave an ambiguous verdict. The court's questions simply elucidated the fact that the jurors were convinced that Goodman had been guilty of murder under both theories, not under one or the other, without specifying which. *See State v. Goodman*, 298 N.C. at 18-20, 257 S.E. 2d at 581-82.

The result is:

83CRS38438—murder in the first degree—no error.

83CRS39442—felonious larceny—no error.

84CRS4840—armed robbery—no error.

83CRS39442—burglary in the second degree—judgment arrested.

—felony murder based upon burglary—verdict vacated.