McCULLOUGH, Judge.
 

 *763
 
 Defendant James Cornelius McNeill appeals from judgment entered upon his conviction for first degree felony murder. For the reasons stated herein, we hold no error.
 

 *764
 
 I.
 
 Background
 

 On 25 April 2011 defendant was indicted for first degree murder in violation of N.C. Gen.Stat. § 14-17, common law robbery in violation of N.C. Gen.Stat. § 14-87.1, and felony larceny in violation of N.C. Gen.Stat. §§ 14-72(a) and 14-70.
 

 Defendant's trial commenced at the 10 February 2014 criminal session of Cumberland County Superior Court, the Honorable Douglas B. Sasser, presiding. The State's evidence tended to show the following: Robert Farmer testified that he met Jeremy Dixon in early 2009. Farmer lived in Raleigh and Dixon lived in Fayetteville. After learning that Dixon was a homosexual, Farmer testified that he "took him under my wing" and because Farmer was older than Dixon, and "a little bit more experienced in the lifestyle, I was the mother-figure as far as in the gay community with him." They both worked in the nursing field and would call each other often. Farmer testified that he would visit with Dixon in Fayetteville "[a]lmost every weekend."
 

 On 30 July 2010, a Friday, Farmer headed to Fayetteville to visit Dixon. He had a key to Dixon's apartment and Dixon told Farmer that "if he wasn't home when I got there, you know, just to go on in and make myself at home, like he always did, and he would be there when he got off of work." When he arrived at Dixon's apartment that night, Farmer let himself in and testified that he did not notice anything unusual about Dixon's apartment. The next morning, on Saturday, Farmer saw Dixon around 8:00 a.m. They talked and spent some time together until the afternoon. Dixon attended a party with his church that afternoon. Farmer testified that he returned to Raleigh.
 

 Farmer spoke with Dixon to let him know that he was going to come back to Fayetteville that Saturday night, 31 July 2010. Dixon told Farmer to "call him back when I got to Fayetteville, because he had company, and he would unlock the door for me." Farmer arrived somewhere between 11:00 p.m. and midnight with a guest at Dixon's apartment. When Farmer arrived, Dixon came to his bedroom door, stuck his head out and told Farmer "he wanted to make sure that it was me coming in; and, I told him yeah, and okay, well, you know make yourself comfortable or whatever, and he went back in." That night, Farmer slept in the living room of Dixon's apartment with his guest. During the night, Farmer could hear noises-"sexual in nature"-coming from Dixon's bedroom made by a male voice.
 

 The next morning at 5:00 a.m., 1 August 2010, Farmer left Dixon's apartment to attend a funeral in Roanoke Rapids. Farmer's guest also left
 
 *765
 
 Dixon's apartment at that time. On the evening of 1 August 2010, after the funeral, Farmer spoke with Dixon over the phone. Dixon informed Farmer that "he was at a store with the friend that he had at the house." Dixon also stated that "the other guy was in the store" and that he was "frightened."
 

 On 2 August 2010, Farmer tried to call Dixon several times throughout the day, beginning at 7:00 a.m. but did not get an answer. Once Farmer got off of work at 5:00 p.m., he drove to Fayetteville and went straight to Dixon's apartment. He did not see Dixon's vehicle, a 2006 black Chevy Cobalt with rear tinted windows and Maryland license plates. Farmer drove around town and spoke to several individuals, searching for Dixon. He learned that Dixon was scheduled to work, but had failed to appear.
 

 Officer Aubry Raymond of the Fayetteville Police Department testified that on Wednesday, 3 August 2010, she was dispatched to the Summertime Apartments in reference to a well-being check. Farmer informed Officer
 
 *460
 
 Raymond that he had not been able to make contact with Dixon since Sunday. Officer Raymond approached the door to Dixon's apartment, cracked it open, and saw Dixon lying dead on the living room floor.
 

 At the scene, police found blood splatter on the walls, a bloody comforter, a bloody inflatable mattress, and part of a broken glass bottle on the living room floor. Zachary Kallenbach, a forensic scientist supervisor in the DNA section of the North Carolina State Crime Lab, testified regarding the broken glass bottle found shattered on the floor of Dixon's living room. The partial DNA profile obtained from a swabbing of the top of the broken bottle matched the DNA profile obtained from defendant and did not match the DNA profile of Dixon. A white tank top was found on the floor of Dixon's living room within a foot away from Dixon's body. An analysis of the neck area of the tank top revealed a mixture of DNA, the predominant profile matching defendant. A white hooded sweatshirt was also found lying across Dixon's body. The sweatshirt had blood on the cuffs and on the sleeve. Kallenbach testified that the DNA profile obtained from the neck area of the hooded sweatshirt was consistent with a mixture and neither defendant nor Dixon could be excluded as a contributor. A DNA analysis of the sleeves, chest, and inside, bottom of the sweatshirt matched Dixon and did not match defendant.
 

 Brittany McLaughlin, a forensic technician with the Fayetteville Police Department, testified that she collected 17 latent fingerprints from Dixon's apartment. Trudy Wood, a latent examiner with the
 
 *766
 
 Fayetteville Police Department, testified that she reviewed the 17 latent prints collected by McLaughlin. Two latent fingerprints, collected from the exterior door surface of a fuse box located on Dixon's bedroom wall and collected from the exterior surface of a drinking glass in Dixon's kitchen, matched defendant.
 

 Jonathan Privette, a forensic pathologist that was employed at the Office of the Chief Medical Examiner in Chapel Hill, North Carolina in 2010, testified that he performed an autopsy of Dixon on 4 August 2010. Privette testified that in his opinion, the cause of death for Dixon was blunt-force injuries to his head. Privette testified that Dixon had injuries to his lips, face, eyes, head, and neck. Dixon had lacerations on his head and suffered from a subdural hemorrhage and swelling of the brain, but his skull was not fractured. Privette testified that Dixon's injuries were consistent with being beaten to death with feet or hands. In reference to the lacerations Dixon suffered on his skull, Privette testified that "[a] bottle could cause those injuries."
 

 Jacqueline Samuel testified that in August and September of 2010, she met and dated defendant in Lumberton, North Carolina. They lived together at her apartment in Lumberton for approximately two months. During the time they lived together, defendant had injuries on his chest and back. The injuries "had glass in them [demonstrating]. They was deep. He should have had stitches." Samuel believed the injuries, which continued to bleed, were "a couple weeks" old. Defendant "kept picking at them." Samuel also observed fresh scars on the knuckles of defendant's hands. When asked whether defendant indicated why he had left Fayetteville, Samuel testified that defendant said because he "like [sic] to beat a man to death."
 

 Samuel further testified that during their time together, defendant used a black, 4-door vehicle with Maryland license plates. The rear windows of the vehicle were tinted and it had a spare tire on it. Defendant would not allow anyone else to drive the vehicle. When Samuel's landlord requested the registration and insurance of the vehicle, defendant was unable to provide it. Defendant continuously moved the location of where he parked the vehicle and Samuel testified to hearing defendant inquire about obtaining tags for the vehicle, as well as the location of a salvage yard to dispose of the vehicle. Dixon's vehicle, which was valued in excess of $9,000, was never recovered.
 

 Defendant was arrested in Lumberton, North Carolina. In his possession was a wallet and cell phone at the time of arrest. Defendant's wallet contained a piece of paper with Dixon's mother's name written
 
 *767
 
 on it, the name of her bank, and her checking account
 
 *461
 
 number. Dixon's mother identified the writing on the paper as Dixon's handwriting.
 

 Defendant testified on his own behalf. Defendant testified that he met Dixon on 1 August 2010 at a convenience store. Defendant was buying some cigars and as he was leaving, a man behind him "said he wanted to holler at me." The man, who defendant identified as named "Black," was purchasing a 40 ounce bottle of beer and asked defendant if had any marijuana for sale. Continuing their conversation outside of the store, defendant told Black that he had "a little bit" and that he was "going to get some more." Black was interested in trying the marijuana before he purchased any from defendant. Black told defendant that he was riding with his cousin, Dixon, and defendant testified that Dixon was driving a black vehicle. Defendant rode with Dixon and Black and arrived at Dixon's apartment.
 

 Defendant testified that before he sat on Dixon's sofa, he remembered moving an object out of the way before he sat down and stated that it could have possibly been the hooded sweatshirt. Defendant finished rolling a blunt in the living room of Dixon's apartment while Dixon and Black stepped into Dixon's bedroom to talk. When they came out of the bedroom, Black asked defendant if he wanted something to drink and brought defendant a drinking glass. Defendant poured himself some beer and testified that he touched the top of the beer bottle.
 

 Defendant lit a blunt and started smoking marijuana. He passed it to Black, who also smoked the blunt. Black was "talking about how good it was. He said he got to have some" and stated that he wanted to purchase an ounce from defendant. While defendant and Black smoked in the living room, Dixon was watching television. Defendant got up to use Dixon's bathroom. As he was exiting the bathroom, he tripped, stumbled, and in order to break his fall, grabbed onto the wall. Defendant testified that he could have touched the fuse box with his hand during his attempt to break his fall. Defendant returned to the living room and discussed how he would go to get the ounce of marijuana. Black stated that defendant could use Dixon's car if he would "come straight back." Defendant agreed to this and "gave [Black his] word." Black and Dixon went into the bedroom for a couple of minutes to talk. Black returned and said "it was a go." Dixon handed Black $120 and Black gave the money to defendant. Defendant testified that at that point, "as [Dixon and Black] were coming out, you know, the vibe I picked up ... it was like a homosexual-just two-it was touching, you know; and, when they went back and sat down, they was sitting close up on each other." Dixon gave defendant the keys to his car and defendant left, telling Dixon and
 
 *768
 
 Black that it would take him five to ten minutes. Defendant testified that although he initially planned to return to Dixon's apartment, he changed his mind upon realizing that Black and Dixon were homosexuals and decided not to return with Dixon's vehicle.
 

 Defendant headed to Lumberton because he "had a probation violation, number one; and, I had planned on turning myself in on the probation violation." He met with Samuel in Lumberton a couple of days later. Defendant admitted that he knew he had a probation violation and a warrant out for his arrest based on a fight that he was involved in-"around July 15, I remember I got in a fight." Defendant planned on finishing out the summer with Samuel and then turning himself in to serve a six to eight month sentence. On cross-examination, defendant admitted to a prior conviction for assault with a deadly weapon which occurred on 15 July 2010. The name of the victim in that fight was Dwayne Anderson and the fight occurred at a boardinghouse. Defendant testified that Anderson pulled a gun on him and they wrestled, throwing furniture at each other. Defendant admitted that he hit Anderson with a box-cutter, resulting in serious injury.
 

 Defendant testified that two weeks after having Dixon's vehicle in his possession, he noticed the piece of paper with Dixon's mother's checking account information. He put it in his pocket because he knew the vehicle "might have been reported-probably-reported to the cops stolen." Defendant then parked Dixon's vehicle and abandoned it with the keys inside.
 

 *462
 
 At the close of all the evidence, defendant moved to dismiss the charge of common law robbery and the trial court granted his motion. On 24 February 2014, a jury found defendant guilty of first degree murder under the felony murder rule as to felony larceny with the use of a deadly weapon. Defendant was sentenced to a term of life imprisonment without parole. Defendant appeals.
 

 II.
 
 Discussion
 

 On appeal, defendant argues that the trial court erred by (A) denying his motion to dismiss the charge of first degree felony murder and by instructing the jury on felony murder based on insufficiency of the evidence; (B) allowing the prosecutor to make an improper closing argument; and (C) by failing to arrest judgment on the larceny conviction.
 

 A.
 
 Motion to Dismiss
 

 Defendant contends that the State failed to present sufficient evidence on the charge of first degree felony murder with felony larceny as
 
 *769
 
 the underlying predicate felony. Specifically, defendant argues that: (1) there was insufficient evidence to show that the glass bottle found at the crime scene constituted a "deadly weapon"; (2) that the alleged larceny was committed with the "use" of the glass bottle; and (3) that the killing occurred "in the perpetration" of the felonious larceny.
 

 "A motion to dismiss for insufficiency of the evidence is properly denied if substantial evidence exists to show: (1) each essential element of the offense charged; and (2) that defendant is the perpetrator of such offense."
 
 State v. Fuller,
 

 166 N.C.App. 548
 
 , 554,
 
 603 S.E.2d 569
 
 , 574 (2004). While assessing a defendant's motion to dismiss for insufficiency of the evidence, "[t]he trial court's function is to test whether a reasonable inference of the defendant's guilt of the crime charged may be drawn from the evidence. The evidence is to be considered in the light most favorable to the State."
 

 Id.
 

 (internal citations and quotation marks omitted). "[T]he State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom; contradictions and discrepancies are for the jury to resolve and do not warrant dismissal[.]"
 
 State v. Powell,
 

 299 N.C. 95
 
 , 99,
 
 261 S.E.2d 114
 
 , 117 (1980). This court reviews the trial court's denial of a motion to dismiss
 
 de novo.
 

 State v. Smith,
 

 186 N.C.App. 57
 
 , 62,
 
 650 S.E.2d 29
 
 , 33 (2007).
 

 First degree felony murder is a murder "committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon[.]" N.C. Gen Stat. § 14-17(a) (2013). To find a defendant guilty of larceny, the State must prove that the defendant "(1) took the property of another; (2) carried it away; (3) without the owner's consent, and (4) with the intent to deprive the owner of the property permanently."
 
 State v. Reeves,
 

 62 N.C.App. 219
 
 , 223,
 
 302 S.E.2d 658
 
 , 660 (1983) ;
 
 See
 
 N.C. Gen.Stat. § 14-72 (2013). To convict a defendant of felonious larceny, the State must prove an additional element demonstrating that the value of the stolen property is more than $1,000.00. N.C.G.S. § 14-72(a).
 

 First, we address defendant's assertion that the State failed to demonstrate that the beer bottle found at the crime scene was used as a "deadly weapon" within the meaning of N.C. Gen.Stat. § 14-17. Defendant argues that evidence that the bottle "could" have caused Dixon's injuries amounted to speculation or conjecture and was not substantial. Defendant's arguments are without merit.
 

 "A dangerous or deadly weapon is generally defined as any article, instrument or substance which is likely to produce death or great
 
 *770
 
 bodily harm."
 
 State v. Flaugher,
 

 214 N.C.App. 370
 
 , 387,
 
 713 S.E.2d 576
 
 , 589 (2011). There is no "mechanical definition" for "[t]he distinction between a weapon which is deadly or dangerous per se and one which may or may not be deadly or dangerous depending upon the circumstances[.]"
 
 State v. Torain,
 

 316 N.C. 111
 
 , 121,
 
 340 S.E.2d 465
 
 , 471 (1986). "Only where the instrument, according to the manner of its use or the part of the body at which the blow is aimed, may or may not be likely to produce such results,
 
 *463
 
 its allegedly deadly character is one of fact to be determined by the jury."
 
 Flaugher,
 

 214 N.C.App. at 387
 
 ,
 
 713 S.E.2d at 589
 
 (citation and quotation marks omitted).
 

 In the present case, Zachary Kallenbach, a forensic scientist at the North Carolina State Crime Lab, testified that defendant's DNA profile matched the DNA obtained from the top of a broken bottle found at the scene of the crime. Jonathan Privette, a forensic pathologist who performed the autopsy on Dixon's body, testified that Dixon died as a result of blunt force injuries to his head. Dixon suffered semicircular lacerations, which are tears to the tissue or skin caused by a blunt object striking the surface of the skin, on his skull and head. Dixon also suffered from a subdural hemorrhage, as well as swelling of the brain. The following exchange occurred between the State and Privette:
 

 Q. Injuries that you noted and showed the jury of the lacerations around the top of Mr. Dixon's skull, were those consistent with the injuries that could have been caused by a bottle breaking-or, a broken bottle striking the back of the head of Mr. Dixon?
 

 A. A bottle could cause those injuries.
 

 Our Courts have established that "a substantial evidence inquiry examines the sufficiency of the evidence presented
 
 but not its weight,
 
 which is a matter for the jury."
 
 State v. Hunt,
 

 365 N.C. 432
 
 , 436,
 
 722 S.E.2d 484
 
 , 488 (2012) (emphasis in original). Therefore, the weight of Privette's testimony and whether the bottle was likely to produce death or great bodily harm was a question for the jury. Taking the evidence in the light most favorable to the State, we hold that the State presented sufficient evidence that the broken beer bottle found at the scene of the crime constituted a deadly weapon.
 

 Next, defendant argues that the State failed to provide sufficient evidence that defendant "used" the broken bottle during the commission of the felonious larceny. Defendant concedes that the State does not need to prove that the deadly weapon was used to effectuate the underlying felony, but argues that the State "must prove, at a minimum, that the
 
 *771
 
 accused was in possession of a deadly weapon at the time the felony was committed."
 

 N.C. Gen.Stat. § 14-17 (2013) provides that the murder is "committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary,
 
 or other felony committed or attempted with the use of a deadly weapon
 
 shall be deemed murder in the first degree[.]" (emphasis added). In order to satisfy the "use" language of the felony murder statute, the defendant must either possess the deadly weapon in the commission of the underlying predicate felony or use that weapon to effectuate the felonious act.
 
 See
 

 State v. Fields,
 

 315 N.C. 191
 
 , 199,
 
 337 S.E.2d 518
 
 , 523 (1985) (holding that mere possession of a deadly weapon is sufficient to constitute "use" of that weapon "even if the weapon is not
 
 physically
 
 used to actually commit the felony").
 

 Defendant relies primarily on
 
 State v. Pakulski,
 

 319 N.C. 562
 
 ,
 
 356 S.E.2d 319
 
 (1987), for his contention. In
 
 Pakulski,
 
 the unarmed defendants broke into a doctor's office with the intent to commit robbery.
 
 Id.
 
 at 566,
 
 356 S.E.2d at 322
 
 . After being confronted by a security guard, one of the defendants stole the security guard's gun, which he then used to shoot and kill the security guard.
 

 Id.
 

 After killing the victim, the defendants proceeded to rob both the doctor's office and the victim, taking money, keys and other belongings from the deceased.
 

 Id.
 

 In
 
 Pakulski,
 
 the North Carolina Supreme Court held that while there was sufficient evidence to warrant an instruction allowing the jury to find that murder was committed in the course of an armed robbery, there was insufficient evidence presented that felonious breaking and entering could serve as the underlying felony for a felony murder charge based on the fact that the State "failed to prove possession of a deadly weapon at the time of the felonious breaking or entering."
 
 Id.
 
 at 573,
 
 356 S.E.2d at 326
 
 .
 

 In
 
 Pakulski,
 
 the State conceded that defendants did not use a deadly weapon to accomplish the breaking and entering of the doctor's office and there was no evidence that
 
 *464
 
 the defendants possessed a deadly weapon at the time of breaking and entering.
 

 Id.
 

 However, in the case
 
 sub judice,
 
 the evidence when viewed in the light most favorable to the State, tends to show that incapacitating Dixon with the deadly weapon-the broken bottle-was a prerequisite to the larceny of Dixon's vehicle. During trial, the State presented evidence of Dixon's blood found on a broken piece of glass found inside the apartment and splattered across a wall beside Dixon's dead body. The State presented evidence of defendant's DNA found on the neck of the bottle and an autopsy of the victim showing circular lacerations on Dixon's skull. During trial, Privette testified that
 
 *772
 
 a glass bottle could have caused the lacerations found on Dixon's head and skull. In his own testimony, defendant admitted to both possessing the glass bottle while inside Dixon's apartment and also driving away with Dixon's vehicle. Based on the foregoing evidence, a jury could reasonably infer that the bottle was used to incapacitate the victim, which facilitated defendant's larceny of Dixon's vehicle. It would be a reasonable inference from the evidence in this case that defendant "used" the glass bottle in the same manner and for the same purpose as the defendants in
 
 Pakulski
 
 used the security guard's gun to facilitate the taking of the victim's property and commission of armed robbery.
 

 Lastly, defendant contends that the State failed to present sufficient evidence that the killing was committed "in the perpetration" of the larceny. Defendant contends that there was only a speculation that the theft of Dixon's vehicle and Dixon's murder occurred during a single transaction. We disagree.
 

 "A killing is committed in the perpetration or attempted perpetration for the purposes of the felony murder rule where there is no break in the chain of events leading from the initial felony to the act causing death so that the homicide is part of [a] series of incidents which form one continuous transaction."
 
 State v. Carroll,
 

 356 N.C. 526
 
 , 534,
 
 573 S.E.2d 899
 
 , 905 (2002). Whether defendant's intent to steal Dixon's car was formulated before or after the killing is inconsequential, so long as the sequence of events constituted a single transaction.
 
 See
 

 Fields,
 

 315 N.C. at 203
 
 ,
 
 337 S.E.2d at 525
 
 ("[I]t makes no difference whether the intent to steal was formulated before the use of force or after it, so long as the theft and the use or threat of force can be perceived by the jury as constituting a single transaction.");
 
 See also
 

 State v. Handy,
 

 331 N.C. 515
 
 , 529,
 
 419 S.E.2d 545
 
 , 552 (1992) ( "Neither the commission of armed robbery ... nor the commission of felony murder based on armed robbery depends upon whether the intention to commit the taking of the victim's property was formed before or after the killing.") (internal citations omitted).
 

 Here, defendant relies primarily on
 
 State v. Powell,
 

 299 N.C. 95
 
 ,
 
 261 S.E.2d 114
 
 (1980). In
 
 Powell,
 
 the defendant killed the victim during the perpetration of first degree rape and subsequently stole the victim's television and car.
 
 Id.
 
 at 96-97,
 
 261 S.E.2d 116
 
 . The
 
 Powell
 
 Court upheld the defendant's conviction of first degree felony murder on the basis of first degree rape. However, the
 
 Powell
 
 Court found that the State was unable to establish a necessary element of robbery with a dangerous weapon-"that the defendant took the objects from the victim's presence by use of a dangerous weapon"-because the victim had already died before the
 
 *773
 
 defendant took the objects.
 
 Id.
 
 at 102, 261 S.E.2d at 119. As a result, the Court reversed the trial court's denial of the motion to dismiss the charge of robbery with a dangerous weapon.
 
 Id.
 

 As the State points out, the victim's presence, while required under the State's armed robbery statute pursuant to N.C. Gen.Stat. § 14-87, is not an element of larceny. In
 
 Powell,
 
 the State failed to provide sufficient evidence of the victim's presence during the felonious robbery, making it inoperative as the underlying predicate felony. Because presence of the victim is not required under the larceny statute, the holding in
 
 Powell
 
 with respect to the victim's presence is irrelevant to the present case. In so much as
 
 Powell
 
 is relevant to the case before us, however, it weighs against defendant's argument. The
 
 Powell
 
 Court indicated that the evidence in that case tended to show that the
 
 *465
 
 defendant was guilty of larceny, rather than robbery, because the former does not require the presence of the victim.
 
 See
 

 Powell,
 

 299 N.C. at 102
 
 , 261 S.E.2d at 119 (stating that "while possession by defendant of the television and automobile belonging to [the victim] gave the inference that defendant took them, and therefore committed the crime of
 
 larceny,
 
 there is no substantial evidence giving rise to the reasonable inference that the defendant took the objects from the victim's presence by use of a dangerous weapon").
 

 Rather, the circumstances of the present case is similar to those found in
 
 State v. Bush,
 

 289 N.C. 159
 
 ,
 
 221 S.E.2d 333
 
 (1976),
 
 death sentence vacated,
 

 429 U.S. 809
 
 ,
 
 97 S.Ct. 46
 
 ,
 
 50 L.Ed.2d 69
 
 (1976). In
 
 Bush,
 
 the defendant stole a car and crashed it into a ditch. Two people offered to obtain help for the defendant but he refused their offers.
 

 Id.
 

 at 173
 
 ,
 
 221 S.E.2d at 342
 
 . The defendant did not attempt to find a telephone, nor did he attempt to use an outside pay telephone that he passed.
 

 Id.
 

 Soon thereafter, the defendant entered into a nearby house. Once inside the house, he killed the occupant and stole the victim's car keys from his pants pocket.
 
 Id.
 
 at 163-64,
 
 221 S.E.2d at 335
 
 . As the defendant prepared to leave in the victim's car, the victim's wife arrived at the house. The defendant followed her into the house, took money from her, cut the telephone line, and tied her into a chair. The defendant also took a rifle and some ammunition before he drove away in the victim's vehicle.
 
 Id.
 
 at 164,
 
 221 S.E.2d at 336
 
 . On appeal, the defendant argued that the trial court erred by submitting the charge of first degree felony murder because the defendant did not intend to commit robbery until
 
 after
 
 he had killed the deceased victim.
 
 Id.
 
 at 173,
 
 221 S.E.2d at 342
 
 . The
 
 Bush
 
 Court reviewed the evidence in the light most favorable to the State and concluded that defendant's actions were guided and controlled by an "intent to steal and rob" and that the defendant killed the victim while "in the perpetration" of a robbery.
 
 Id.
 
 at 174,
 
 221 S.E.2d at 342
 
 .
 

 *774
 
 Here, the evidence pertinent to this issue, viewed in the light most favorable to the State, establishes that a jury could reasonably infer that Dixon's murder and larceny of Dixon's vehicle comprised a series of incidents, forming one continuous transaction. When defendant first encountered Dixon, he did not have a car and rode with Dixon to his apartment. Within a 24 hour period, defendant killed Dixon. Thereafter, defendant drove off with Dixon's vehicle and did not return it because he needed to leave Fayetteville to avoid an outstanding warrant for his arrest. Samuel testified that during August and September 2010, defendant had access to a vehicle matching the description of Dixon's vehicle. Samuel further testified that defendant sought alternate tags and registration for the vehicle. Contrary to defendant's position that the State failed to prove that there was no break in the chain of events between the murder and larceny, defendant's actions from the day he met Dixon to at least several weeks after Dixon's murder demonstrate that they were guided and controlled by an intent to deprive Dixon of his vehicle permanently. We hold that the evidence was sufficient to permit a jury to find that defendant murdered Dixon in the perpetration of felony larceny. Accordingly, the trial court did not err by denying defendant's motion to dismiss the first degree felony murder charge and instructing the jury on first degree felony murder.
 

 B.
 
 Closing Arguments
 

 In his next argument on appeal, defendant asserts that the prosecutor's closing arguments were grossly improper and that the trial court erred by failing to intervene. Defendant did not object during closing arguments. Defendant now argues that it was grossly improper for the prosecutor to "ask[ ] the jury to believe that, because [defendant] assaulted Dwayne Anderson after being asked to leave, he must have been asked to leave by Jeremy Dixon." Defendant also challenges the prosecutor's characterization of defendant as a "cold person."
 

 The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene
 
 ex mero motu.
 
 In other words, the reviewing court must determine
 
 *466
 
 whether the argument in question strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord and: (1) precluded other similar remarks from the offending
 
 *775
 
 attorney; and/or (2) instructed the jury to disregard the improper comments already made.
 

 State v. Storm,
 

 228 N.C.App. 272
 
 , 279,
 
 743 S.E.2d 713
 
 , 718 (2013) (citation omitted). Grossly improper closing arguments may include "statements of personal opinion, personal conclusions, name-calling, and references to events and circumstances outside the evidence, such as the infamous acts of others."
 
 State v. Jones,
 

 355 N.C. 117
 
 , 131,
 
 558 S.E.2d 97
 
 , 106 (2002).
 

 During closing arguments, the prosecutor stated the following:
 

 According to the defendant's testimony and according to State's Exhibit 142, which you saw this morning, on July the 15th, 2010, a man named Dwayne Anderson told the defendant you've got to leave, and he got beaten with a computer or slashed with a box cutter, 20 stiches and 7 staples, as a result. Two weeks later-or two weeks and a day later, on August the 1st, 2010, Jeremy Dixon tells the defendant, okay, it's time to go; you got to leave; and, Jeremy Dixon is dead. Prompt medical care, according to the examiner, would probably have saved his life; but no, the defendant was too busy making off with his stuff. Who does something like that? One cold person.
 

 After the prosecutor's closing argument, the trial court issued a limiting instruction to the jury, stating the following:
 

 Evidence has been received concerning prior criminal convictions and/or criminal acts not related to the charges the defendant is currently on trial for. You may consider this evidence for one purpose only. If, considering the nature of the crimes, you believe that this bears on the defendant's truthfulness, then you may consider it and all other facts and circumstances bearing upon the defendant's truthfulness in deciding whether you will believe the defendant's testimony at this trial. A prior conviction is not evidence of the defendant's guilt in this case. You may not convict the defendant on the present charges because of something the defendant may have done in the past.
 

 It is well established that "[a] prosecutor must be allowed wide latitude in the argument of hotly contested cases and may argue all the facts in evidence and any reasonable inferences that can be drawn therefrom."
 
 State v. Alford,
 

 339 N.C. 562
 
 , 571,
 
 453 S.E.2d 512
 
 , 516 (1995). "On appeal, particular prosecutorial arguments are not viewed in an isolated
 
 *776
 
 vacuum. [Rather, f]air consideration must be given to the context in which the remarks were made and to the overall factual circumstances to which they referred."
 
 State v. Moseley,
 

 338 N.C. 1
 
 , 50,
 
 449 S.E.2d 412
 
 , 442 (1994) (citations omitted).
 

 Here, the prosecutor was arguing facts already in evidence. Defendant had testified that he fled Fayetteville based on an outstanding warrant for his arrest stemming from the 15 July 2010 assault and testified to the circumstances surrounding that event. In addition, the trial court's limiting instruction directed the jury to consider defendant's prior convictions for impeachment purposes only and that a prior conviction could not be considered as evidence of defendant's guilt in the present case. After thoughtful review of the record, and considering that the prosecutor only made this argument once, we are unable to hold that the prosecutor's reference to the 15 July 2010 incident and suggesting that defendant is a "cold person" were so grossly improper that it interfered with defendant's right to a fair trial or the sanctity of the proceedings. The trial court did not err by failing to intervene
 
 ex mero motu.
 

 C.
 
 Arresting Judgment
 

 In his last argument on appeal, defendant contends that upon his conviction of first degree murder on a theory of felony murder, the trial court erred by failing to arrest judgment on the underlying felony. We agree. Accordingly, judgment is arrested on defendant's conviction of felony larceny.
 
 See
 

 *467
 

 State v. Wilson,
 

 345 N.C. 119
 
 , 122,
 
 478 S.E.2d 507
 
 , 510 (1996) (stating that "when the sole theory of first-degree murder is the felony murder rule, a defendant cannot be sentenced on the underlying felony in addition to the sentence for first-degree murder").
 

 III.
 
 Conclusion
 

 The trial court did not err by denying defendant's motion to dismiss the charge of first degree felony murder, instructing the jury on the charge of first degree felony murder, or by failing to intervene
 
 ex mero motu
 
 during the prosecutor's closing arguments. However, we arrest judgment on defendant's felony larceny conviction.
 

 NO ERROR AS TO THE CONVICTION OF FIRST DEGREE MURDER; JUDGMENT ARRESTED AS TO THE CONVICTION OF FELONY LARCENY.
 

 Judges STROUD and INMAN concur.