Filed 7/11/16

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>JOSON VANG,<br><br>        Defendant and Appellant. | C075731<br><br>(Super. Ct. No. 09F07077) |

APPEAL from a judgment of the Superior Court of Sacramento County, Steve W. White, Judge. Modified and remanded with directions.

Kat Kozik, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos Martinez, Chung Mi (Alexa) Choi, Deputy Attorneys General, for Plaintiff and Respondent.

---

*        Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part II of the discussion.

1

In this case, we conclude the death of a structure's inhabitant renders that structure uninhabited within the meaning of the arson statute. This is so even where the arsonists murder that inhabitant before setting fire to the structure.

Defendant Joson Vang and his cousin, Ronnie Vang,[1] broke into Keith Fessler's house to steal some property. Fessler was home at the time. When he came out of a back bedroom and confronted the burglars, they beat him, tied him up, and Ronnie executed him with two shots to the back of the head. After taking several items from the house and leaving with these items in Fessler's car, defendant and Ronnie came back and set fire to the house. Defendant and Ronnie were tried together before separate juries. Defendant's jury convicted him of first degree murder, first degree burglary, robbery, arson of an inhabited structure, and the unauthorized taking or driving of a vehicle. With respect to the murder, the jury found the crime was committed during the commission of both a burglary and a robbery. The jury also found a principal was armed with a firearm during the commission of the murder, burglary, and robbery. The trial court sentenced defendant to serve life imprisonment without the possibility of parole, plus a consecutive determinate term of nine years eight months.

On appeal, defendant contends: (1) the evidence is insufficient to support his arson of an inhabited structure conviction because Fessler was dead when he and Ronnie set fire to Fessler's house and there was no evidence anyone else lived there or intended to live there; and (2) the trial court violated the *Aranda/Bruton* rule,[2] and thereby violated

---

**1** Because defendant and his cousin have the same last name, to avoid confusion, we refer to the latter by his first name throughout this opinion. Others who share this last name shall also be referred to by their first names.

**2** *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476] (*Bruton*); *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*).

defendant's right of cross-examination under the Sixth Amendment's confrontation clause, by admitting against defendant certain out-of-court statements Ronnie made to two individuals that implicated defendant in the charged crimes and defendant conceded were non-testimonial in nature.

In the published portion of this opinion, we conclude defendant's arson of an inhabited structure conviction must be modified to convict him of arson of a structure. As we shall explain, Fessler's death rendered his house uninhabited. While it is troubling defendant shall be subject to less punishment for what would otherwise be arson of an inhabited structure because he and his cousin murdered the inhabitant before setting fire to the house, we agree with various decisions of our fellow Courts of Appeal that the statutory term "inhabited" requires a present intent to use the structure as a dwelling. The dead simply cannot have such an intent. This is so regardless of how they came to be deceased. Prior iterations of our arson statute would have allowed for conviction of arson of an inhabited structure on these facts. Thus, if the Legislature is troubled by the outcome of this case, it can amend the statute. But we are bound to apply the law as it is presently written. We also note defendant incurred the harshest punishment available short of the death penalty for Fessler's murder.

In the unpublished portion of the opinion, we reject defendant's remaining claim his confrontation rights were violated by the admission of certain statements made by Ronnie. The concededly non-testimonial nature of these challenged statements ends the inquiry under the confrontation clause.

## FACTS

Defendant does not challenge the sufficiency of the evidence to support his convictions, except for arson of an inhabited structure based on the undisputed fact Fessler was dead when the fire was set. We therefore dispense with a detailed recitation

3

of the evidence adduced against him at trial. The following brief summary of events will suffice.

The morning of June 23, 2009, defendant and Ronnie set out to burglarize houses in the Meadowview neighborhood of Sacramento. After an unsuccessful attempt to gain entry to one house, they moved their efforts to Fessler's adjacent house.

Ronnie knocked loudly on Fessler's front door and did not receive a response. Believing no one was home, Ronnie and defendant entered the house through either a rear window or sliding glass door and began searching for property to steal. The burglars apparently had masks, but Ronnie was not wearing his. When Fessler came out of his bedroom and confronted them, Ronnie pulled a 9-millimeter handgun and pointed it at him. Fessler pleaded for his life and told them to take whatever they wanted. Concerned Fessler had seen his face and could identify him as one of the burglars, Ronnie decided to kill him. Before doing so, Ronnie and defendant "roughed him up" and hog-tied him with several of his neck ties. Ronnie then executed Fessler with two shots to the back of the head.

After murdering Fessler, defendant and Ronnie stole several of his guitars and windsurfing boards, among other items, loaded them into Fessler's small SUV, and drove away in the vehicle. They took the stolen property to a nearby house on Montecito Way (Montecito house) that was routinely used as a gambling parlor by various people associated with defendant and Ronnie, including Tom Vang and Ying Vue. Tom spent the previous night at the Montecito house with his girlfriend. After the stolen property was unloaded from the stolen SUV, defendant and Ronnie borrowed Tom's car and returned to Fessler's house with some gasoline Ronnie used to set fire to the house to eliminate any potential evidence.

4

Defendant and Ronnie then returned to the Montecito house, where defendant called Vue and asked him to come over and bring shirts and gasoline. Vue did so. When Vue arrived, both defendant and Ronnie were sweating and Ronnie was not wearing a shirt. Ronnie washed his hands with the gasoline in the garage. At some point that afternoon, Fessler's SUV was also moved from the Montecito house and parked a short distance away on 67th Avenue. During the early morning hours of the following day, defendant and Ronnie drove defendant's car to where the SUV was parked. Using some of the gasoline Vue brought over, they also set that vehicle on fire.

Without recounting all of the evidence admitted against defendant at trial, we note he and Ronnie were identified as suspects in Fessler's murder after they attempted to sell several of the stolen guitars to a pawn shop. Ronnie also made various incriminating statements to Tom and Vue that implicated defendant in the burglary, murder, and subsequent arson. We recount these statements in greater detail in the discussion portion of the opinion. Finally, we also note defendant admitted to another cousin that he and Ronnie "burned down the house and robbed a guy." When asked why, defendant responded, "we're just thugs."

DISCUSSION

I

*Arson of an Inhabited Structure*

Defendant contends the evidence is insufficient to support his arson of an inhabited structure conviction because Fessler was dead when they set fire to his house and there was no evidence anyone else lived there or intended to live there. We agree.

"'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value,

5

from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1077; *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560].)

Penal Code section 451 provides: "A person is guilty of arson when he or she willfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels, or procures the burning of, any structure, forest land, or property." Where the structure or property burned is "inhabited," the crime is "a felony punishable by imprisonment in the state prison for three, five, or eight years." (Pen. Code, § 451, subd. (b).) "'Inhabited' means currently being used for dwelling purposes whether occupied or not." (Pen. Code, § 450, subd. (d).)

Defendant does not challenge the sufficiency of the evidence to support the fact he committed arson; he does dispute the structure burned was "inhabited." Relying primarily on *People v. Jones* (1988) 199 Cal.App.3d 543 (*Jones*) and *People v. Ramos* (1997) 52 Cal.App.4th 300 (*Ramos*), and the undisputed fact Fessler was dead when defendant and Ronnie set fire to his house, defendant argues Fessler lacked the present intent to use the house as his dwelling and, therefore, the house was not inhabited. Having found no published California decisions directly on point, we provide a detailed explication of the case law we find to be analogous, including *Jones* and *Ramos*.

In *Jones*, *supra*, 199 Cal.App.3d 543, the Court of Appeal held that in determining whether or not a structure is "inhabited" for purposes of arson, "it is the present intent to use the [structure] as a dwelling which is determinative." (*Id*. at p. 548.) There, the defendant and others resided in a rented house. The day after he and the others were evicted, after the others had removed their belongings and left, the defendant set fire to the house. (*Id*. at p. 545.) Rejecting the defendant's argument the house was not inhabited because he and the other former tenants no longer had any possessory rights to

6

the house following the eviction, the court explained, "[t]he question is whether the house was inhabited, not whether the inhabitants had a legal right to be there." (*Id*. at p. 546.) Rejecting the Attorney General's argument whether "the purpose of the structure is to serve as a dwelling" should control, the court explained such an interpretation of the statute "would lead to results that are logically unacceptable and inconsistent with legislative intent," for example, "if the owner-occupant of a house died, the house would be 'inhabited' by a dead person." (*Ibid*.)

The court then supported its holding that the present intent to use the structure as a dwelling controls the determination of whether or not the structure is "inhabited" with an overview of the history of California arson statutes: "The first arson statute, enacted in 1850, made it a crime to burn 'any dwelling house' but did not define the term 'dwelling house.' (Stats. 1850, ch. 99, § 56, pp. 234-235.) In 1856, arson was divided into degrees. First degree arson included burning 'in the nighttime, any dwelling-house in which there shall be at the time some human being . . . .' Second degree arson included burning a dwelling house in which no one was present. The statute further provided, 'Every house . . . which shall have been usually occupied by persons lodging therein at night, shall be deemed a dwelling-house of any person so lodging therein . . . .' (Stats. 1856, ch. 110, §§ 4, 6.) [¶] Subsequent amendments did not materially alter the statute until 1929. In that year, section 447a was added to the Penal Code defining arson in part as burning 'any dwelling house' but the provisions defining a 'dwelling house' were repealed. (Stats. 1929, ch. 25, § 1.) Finally, the arson statute was revised in 1979 to provide, 'Arson that causes an inhabited structure . . . to burn is a felony . . . .' (Pen. Code, § 451, subd. (b).) The statute defines 'structure' as a 'building' and 'inhabited' as 'currently being used for dwelling purposes whether occupied or not.' (Pen. Code, § 450, subds. (a) and (d); Stats. 1979, ch. 145, § 6.) [¶] . . . [¶] As can be seen from the review of the arson statute, the

7

Legislature has taken various approaches to the burning of a dwelling. During some periods it has left the term without a definition. During other periods it has defined it as a building 'usually occupied' or 'currently being used.' The present requirement that the building is 'currently being used' is certainly more limiting than the mere reference to a 'dwelling house' and more restrictive than the 1856 requirement the building 'shall have been usually occupied by persons lodging therein . . . .'" (*Jones*, *supra*, 199 Cal.App.3d at pp. 547-548.)

The court concluded: "If arson under [Penal Code] section 451, subdivision (b), could be established by merely proving the defendant set fire to a 'dwelling house' or a building 'usually occupied' as a dwelling then, clearly, [the] defendant's conviction would have been proper. But, the requirement the structure be 'currently used' for dwelling purposes requires the People to prove at least one of the evicted tenants intended to continue living in the house after the eviction." (*Jones*, *supra*, 199 Cal.App.3d at p. 548.) Finally, the court explained this conclusion was "consistent with the interpretation given identical statutory language in [Penal Code] section 459 applying to burglary," citing analogous burglary cases holding "whether or not the structure was 'inhabited' depended on the intent of the tenants to continue living there." (*Ibid*.)

In *Ramos*, *supra*, 52 Cal.App.4th 300, a burglary case, the defendant entered a house, believing no one was home, with the intent to steal property. Once inside, he discovered the deceased body of the house's former inhabitant, Wagner, who apparently died in his sleep. (*Id*. at pp. 301-302.) Reversing the defendant's first degree burglary conviction for insufficient evidence, the Court of Appeal explained: "To prove first degree burglary of an inhabited dwelling, the People must present evidence that the house is 'currently being used for dwelling purposes, whether occupied or not.' (Pen. Code, § 459.) What this means is that a dwelling is inhabited if the occupant is absent but

8

intends to return and to use the house as a dwelling. [Citations.] To put it plainly, a dead body is not using a house for a 'dwelling' and there is no way to say that a dead [person] is going to return or that he [or she] has an 'intent' of any kind." (*Id.* at p. 302.) Rejecting the Attorney General's argument Wagner "'fully intend[ed] to remain in his house'" before he died, the court stated: "By the time Ramos got there, Wagner was dead and, to the best of our knowledge, unable to entertain any intent of any kind. The house was no longer occupied." (*Id.* at p. 303, citing a number of out-of-state cases, including one arson case involving a murder followed several days later by the burning of the deceased victim's residence, *State v. Ward* (1989) 93 N.C.App. 682, in which the appellate court held at page 686 that "the inhabitant's death certainly renders [a dwelling] uninhabited since someone must 'live' in a dwelling for it to be 'inhabited'"; but see *State v. Campbell* (1992) 332 N.C. 116, 122 [while not disapproving of the foregoing case, holding "for purposes of the [North Carolina] arson statute, a dwelling is 'occupied' if the interval between the mortal blow and the arson is short, and the murder and arson constitute parts of a continuous transaction"].)

*Douglas v. Jacquez* (9th Cir. 2010) 626 F.3d 501 involved facts remarkably similar to our own. There, the habeas petitioner and his brother broke into a house to commit a robbery, murdered the house's inhabitant during the robbery, and then set the house on fire. The petitioner was convicted here in California of first degree murder and arson of an inhabited structure.[3] The federal district court granted habeas relief on one ground, i.e., insufficient evidence to support the petitioner's arson of an inhabited structure conviction based on the undisputed fact the inhabitant of the house was dead at

---

[3]    We affirmed these convictions in an unpublished opinion. (*People v. Douglas* (Mar. 31, 1994, C015431) [nonpub. opn.].) The issue of whether the arson of an inhabited structure conviction was supported by substantial evidence was not before us.

9

the time the fire was set.  This determination was based on *Ramos*.  (*Id*. at pp. 503-504.)
Because California did not appeal this ruling, the Ninth Circuit Court of Appeals
"proceed[ed] under the district court's interpretation of California law," but commented
in a footnote:  "We note, however, two distinctions between this case and *Ramos*.  First,
*Ramos* was a burglary case, not an arson case.  [Citation.]  Second—and more
importantly—the already-deceased occupant in *Ramos* died of natural causes.  [Citation.]
But here, Douglas murdered the inhabitant.  Again, we proceed under the district court's
interpretation of California law.  The extension of *Ramos* to these facts strikes us as
problematic, but not problematic enough to affect the ground for decision."  (*Id*. at p. 504,
fn. 1.)  The court then turned to the issues raised on appeal, which are not relevant to our
case.

Various appellate courts in other states have rejected such a result.  For example,
as already mentioned, the North Carolina Supreme Court has held "a dwelling is
'occupied' [within the meaning of that state's arson statute] if the interval between the
mortal blow and the arson is short, and the murder and arson constitute parts of a
continuous transaction," explaining:  "To accept [the] defendant's argument would be to
say that he is less morally culpable—and hence deserves less punishment—because of his
success in killing the victim prior to setting the house on fire.  We do not believe this to
be the intent of the legislature in enacting the arson statute, nor do we believe it to be
sound public policy."  (*State v. Campbell*, *supra*, 332 N.C. at pp. 121-122.)  Similarly, in
*State v. Edwards* (Minn.App. 1999) 589 N.W.2d 807), a burglary case, the Minnesota
Court of Appeals held the apartment of a murdered tenant is a "dwelling," a term defined
by that state's burglary statute to mean "'a building used as a permanent or temporary
residence'" (*id*. at p. 810), as long as the apartment was so used "in the immediate past"
and "has not been abandoned."  (*Id*. at p. 811; see also *People v. Barney* (2002) 742

10

N.Y.S.2d 451, 452-453 [294 A.D.2d 811, 812-813]; *Cochran v. Commonwealth* (Ky. 2003) 114 S.W.3d 837, 839.)

It is not our place to opine on whether the foregoing out-of-state decisions properly construed the arson or burglary statutes at issue therein. Our task is to construe our own arson statute, which defines "inhabited" to mean "*currently* being used for dwelling purposes whether occupied or not." (Pen. Code, § 450, subd. (d), italics added.) Merriam-Webster defines "current" to mean "presently elapsing" and "occurring in or existing at the present time." (Merriam-Webster's New Collegiate Dict. (11th ed. 2006) p. 306, col. 2.) This temporal limitation distinguishes our statute from those interpreted by the courts in *State v. Edwards*, *supra*, 589 N.W.2d 807, *People v. Barney*, *supra*, 294 A.D.2d 811, and *Cochran v. Commonwealth*, *supra*, 114 S.W.3d 837. Indeed, in the first of these cases, the court specifically noted the Minnesota statute required only that the building be "'used as a permanent or temporary residence'" and explained, "[t]he word 'used' . . . has no fixed meaning in terms of time [and] can sound in the past, present, or future tense." (*State v. Edwards*, *supra*, 589 N.W.2d at pp. 810-811.) Conversely, the word "currently" in our arson statute does have a fixed meaning in terms of time, i.e., occurring at the present time. With respect to the latter two cases, the New York statute required only that the building be "'usually occupied by a person lodging therein at night'" (*People v. Barney*, *supra*, 294 A.D.2d at p. 812), and the Kentucky statute similarly required that the building be "'usually occupied by a person lodging therein'" (*Cochran v. Commonwealth*, *supra*, 114 S.W.3d at p. 838), wording nearly identical to the 1856 version of our own arson statute. (See *Jones*, *supra*, 199 Cal.App.3d at p. 547.) But we are not interpreting this prior version of our statute. The current version requires current inhabitation, i.e., that the structure be inhabited at the present time. The present for purposes of arson is the time the fire is set. (See Pen. Code, § 451 ["person is guilty

11

of arson when he or she willfully and maliciously sets fire to . . . any structure"].) Borrowing from *Jones*: "If arson under [Penal Code] section 451, subdivision (b), could be established by merely proving the defendant set fire to a 'dwelling house' or a building 'usually occupied' as a dwelling then, clearly, [the] defendant's conviction would have been proper. But, the requirement the structure be 'currently used' for dwelling purposes requires the People to prove at least one [person] intended to continue living in the house . . . ." (*Jones*, *supra*, at p. 548.) Fessler's death prevented him from having such an intent. Nor did the prosecution produce any evidence anyone other than Fessler intended to live in the house when the fire was set.

Finally, while the statute at issue in *State v. Campbell*, *supra*, 332 N.C. 116, does appear to have a temporal requirement, i.e., first degree arson in North Carolina requires that "'the dwelling burned was occupied *at the time of the burning*,'" this statute left the basic definition of arson to the common law and did not define either "dwelling" or "occupied." (*Id*. at p. 120, italics added.) Moreover, as previously mentioned, the North Carolina Supreme Court did not disapprove of a prior appellate decision that held an "inhabitant's death certainly renders [a dwelling] uninhabited since someone must 'live' in a dwelling for it to be 'inhabited'" (*State v. Ward*, *supra*, 93 N.C.App. at p. 686), but in effect created an exception to that rule in cases where the arson immediately follows the murder of the dwelling's inhabitant and the murder and arson can be said to constitute a single continuous transaction. (*State v. Campbell*, *supra*, 332 N.C. at pp. 121-122.) In creating this exception, the court extended a "continuous transaction doctrine," which already existed in North Carolina law and was previously applied to robbery cases where the victim was murdered before the defendant formed the intent to steal and sex offense cases where the victim was murdered before the prohibited sex act occurred. (See, e.g., *State v. Fields* (1985) 315 N.C. 191, 201-203 [disagreeing

with the defendant's argument an intent to steal formed after the victim's death vitiates the crime of armed robbery in North Carolina and holding, "when the circumstances of the alleged armed robbery reveal [the] defendant intended to permanently deprive the owner of his [or her] property and the taking was effectuated by the use of a dangerous weapon, it makes no difference whether the intent to steal was formulated before the use of force or after it, so long as the theft and the use of force can be perceived by the jury as constituting a single transaction"]; *State v. Thomas* (1991) 329 N.C. 423, 434 [holding when the prohibited sex act was part of a continuous transaction that began while the victim was alive, it makes no difference whether that victim was dead when the prohibited act occurred].)

Here in California, however, an intent to take the victim's property formed after that victim is dead does vitiate the crime of robbery. (See *People v. Davis* (2005) 36 Cal.4th 510, 561 ["some jurors may have had a reasonable doubt as to whether [the victim] was still alive when the intent to take her rings was formed"].) Similarly, in California, where a victim dies during the commission of an attempted rape, and the defendant thereafter has intercourse with the dead body, the defendant is guilty of murder and attempted rape, but not rape. (See *People v. Kelly* (1992) 1 Cal.4th 495, 524 ["Rape requires a live victim"].) Accordingly, unlike North Carolina, we have a more specific arson statute and no prior precedent from our Supreme Court that would allow us to conclude the temporal limitation written into that statute may be ignored where a murder prevents the prosecution from proving present inhabitation.

Simply put, "present" does not mean "immediate past," even where a murder separates the two. We do acknowledge the outcome is somewhat troubling. What would otherwise be arson of an inhabited structure is mitigated to arson of a structure because the inhabitant was murdered shortly before his or her house was set on fire. However, we

13

may not delete the word "currently" from the arson statute. Our role is to interpret, not to rewrite statutes. (Code Civ. Proc., § 1858.) That is the province of the Legislature.

## II

### *Aranda/Bruton Claim*

Defendant also claims the trial court violated the *Aranda/Bruton* rule, and thereby violated his right of cross-examination under the Sixth Amendment's confrontation clause, by allowing admission of Ronnie's out-of-court statements to Tom and Vue, which "powerfully incriminated" defendant in the crimes involved in this case, even though these statements were admittedly non-testimonial in nature. He is mistaken.

### A.

### *Additional Background*

Ronnie made incriminating statements to Tom and Vue that also implicated defendant in the crimes involved in this case.

Specifically, as Tom explained in his police interview, Ronnie told him that "they broke into a house," a man "came out of the back . . . bedroom," at which point "they kind of roughed him up" and "tied him up," and then Ronnie "shot him." Tom said he also knew "they burned up the house," but that was because his car smelled like gasoline when they returned it to him after doing so. Tom further said he saw Ronnie and defendant leave in defendant's car with gasoline early the next morning, at which point "[t]hey just said they [were] gonna go burn the car." In the context of the statement as a whole, it was clear the "they" to whom Tom was referring were Ronnie and defendant. Indeed, later in the interview, Tom contradicted something he said earlier by saying he did not know whether Ronnie or defendant shot the man, but it was "one of them." At trial, Tom denied Ronnie made these statements and, depending on which statement,

14

claimed either he did not tell the detectives otherwise, did not remember doing so, or was lying when he did so.

Vue testified defendant and Ronnie brought some guitars over to his house in late June or early July of 2009 and tried to sell him the guitars. Inside the garage, Ronnie told Vue he got the guitars "from a stolen vehicle" and then said he got them from "some white guy's house." After initially claiming not to remember the details of Ronnie's statement, when confronted with prior statements he made during his police interview, Vue testified Ronnie admitted he and defendant "broke into the house, took the guitars and put them in the car that was in the garage and left." According to Vue, Ronnie also admitted that when he and defendant were confronted by the man whose house they broke into, they tied him up and Ronnie shot him because "he forgot to put his mask on" and "his face was seen." Ronnie then admitted to setting the house on fire "to clean up his steps so he wouldn't get caught."

The trial court allowed admission of Ronnie's statements to Tom and Vue against both Ronnie and defendant, explaining: "The statements are relevant, non-testimonial and constitute declarations against interest pursuant to Evidence Code section 1230. The court is satisfied through individual review of these statements that they possess sufficient indicia of reliability to plainly fall within the [Evidence Code] section 1230 hearsay exception as declarations against penal interest. As such they are admissible against *both* defendants. An Evidence Code section 1230 exception to the rule against hearsay does not implicate the *Aranda-Bruton* rule." (Citing *People v. Greenberger* (1997) 58 Cal.App.4th 298.) The trial court also ruled the statements were admissible under Evidence Code section 352.

15

## B.

### *Analysis*

"The confrontation clause of the Sixth Amendment to the federal Constitution, made applicable to the states through the Fourteenth Amendment, provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him [or her].'  The right of confrontation includes the right of cross-examination." (*People v. Fletcher* (1996) 13 Cal.4th 451, 455, citing *Pointer v. Texas* (1965) 380 U.S. 400, 404, 406-407 [13 L.Ed.2d 923, 926-927, 927-928].)

The *Aranda/Bruton* rule generally prohibits the admission, at a joint trial, of one defendant's out-of-court statement "that is 'powerfully incriminating' as to a second defendant when determining the latter's guilt." (*People v. Fletcher*, *supra*, 13 Cal.4th at p. 455.)  In *Aranda*, *supra*, 63 Cal.2d 518, our Supreme Court held when the prosecution seeks to introduce an out-of-court statement of one defendant that implicates another defendant, "the trial court must adopt one of three procedures:  (1) in a joint trial, effectively delete direct and indirect identifications of codefendants; (2) grant a severance of trials; or (3) if severance has been denied and effective deletion is not possible, exclude the statement.  In the absence of a holding by the United States Supreme Court, the *Aranda* court declared these rules were not constitutionally compelled, but judicially declared to implement the provisions for joint and separate trials of Penal Code section 1098." (*People v. Song* (2004) 124 Cal.App.4th 973, 980-981, citing *Aranda*, *supra*, 63 Cal.2d at p. 530.)  Three years later, the United States Supreme Court decided *Bruton*, *supra*, 391 U.S. 123, holding the admission in a joint trial of an out-of-court statement made by one defendant that is "powerfully incriminating" as to another defendant violates the latter's right of cross-examination secured by the Sixth Amendment's

16

confrontation clause even if the jury is instructed to consider the statement only against the defendant by whom the statement was made. (*Id*. at p. 137.)

The *Aranda* decision (*supra,* 63 Cal.2d 518) was abrogated in 1982 by the "Truth-in-Evidence" provision of Proposition 8 (Cal. Const., art. I, § 28, former subd. (d), now subd. (f)(2)) "to the extent [that decision] requires the exclusion of evidence that need not be excluded under federal constitutional law." (*People v. Fletcher*, *supra*, 13 Cal.4th at p. 465.)

Thereafter, in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177] (*Crawford*), the United States Supreme Court held the confrontation clause (1) applies only to out-of-court statements that are "testimonial," i.e., offering "testimony" against a defendant (whether or not in a court proceeding), but (2) strictly requires the exclusion of such statements, despite any applicable hearsay exception, unless the declarant is unavailable and the defendant has had a prior opportunity for cross-examination (*id*. at pp. 51-54, 59), overruling *Ohio v. Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597] that held hearsay evidence to be admissible if within a "'firmly rooted hearsay exception'" or bearing "'particularized guarantees of trustworthiness.'" (*Crawford*, *supra*, 541 U.S. at p. 60; see also *Davis v. Washington* (2006) 547 U.S. 813, 821 [165 L.Ed.2d 224] (*Davis*) [only "'testimonial statements' . . . cause the declarant to be a 'witness' within the meaning of the Confrontation Clause"].)

Defendant asserts the *Aranda/Bruton* rule survived *Crawford, supra,* 541 U.S. 36 unscathed, admission of Ronnie's statements to Tom and Vue "powerfully incriminated" defendant, and therefore, the trial court violated his right of confrontation by allowing the statements into evidence regardless of whether the statements were testimonial in nature. Not so. After *Crawford*, "[o]nly the admission of testimonial hearsay statements violates the confrontation clause—unless the declarant is unavailable and the defendant had a

17

prior opportunity to cross-examine the declarant. [Citation.] While the high court [in *Crawford*] declined to precisely define what constitutes a 'testimonial' statement, it held that, at a minimum, testimonial statements include 'prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogations.' [Citation.] The court explained that the confrontation clause addressed the specific concern of '[a]n accuser who makes a formal statement to government officers' because that person 'bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.' [Citation.]" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 812–813.)

Ronnie's statements to Tom and Vue were casual remarks and did not offer testimony against defendant in any sense recognized by *Crawford, supra,* 541 U.S. 36 and its progeny. Defendant does not argue otherwise. Indeed, defendant's trial counsel conceded at trial the statements were non-testimonial in nature. Because "the confrontation clause applies only to testimonial statements," as long as these statements were admissible under state law evidentiary rules, there was no error in the admission of the statements. (*People v. Arceo* (2011) 195 Cal.App.4th 556, 575; see also *Crawford*, *supra*, 541 U.S. at p. 68 [non-testimonial hearsay governed by state law evidentiary rules, not the Sixth Amendment]; *Davis*, *supra*, 547 U.S. at p. 821 [non-testimonial hearsay "subject to traditional limitations upon hearsay evidence," but "not subject to the Confrontation Clause"].) Defendant does not argue the trial court erred in concluding the statements were relevant and admissible under the hearsay exception for statements against penal interest set forth in Evidence Code section 1230, or the trial court erred in admitting the statements under Evidence Code section 352. Instead, he asserts *Arceo* was "wrongly decided" and argues we are bound to apply *Bruton*, *supra*, 391 U.S. 123, to non-testimonial statements following *Crawford*. However, as our colleagues at the

Second Appellate District observed in *Arceo*, "a number of federal courts have expressly held that the *Bruton* rule does not apply to nontestimonial statements." (*Arceo*, *supra*, 195 Cal.App.4th at p. 574; see, e.g., *United States v. Figueroa-Cartagena* (1st Cir.2010) 612 F.3d 69, 85 [*Bruton* must be viewed "through the lens of *Crawford* and *Davis*"; if the challenged statement is not testimonial, the confrontation clause does not apply]; *United States v. Johnson* (6th Cir.2009) 581 F.3d 320, 326 ["Because it is premised on the Confrontation Clause, the *Bruton* rule, like the Confrontation Clause itself, does not apply to nontestimonial statements"].) We agree with the *Arceo* court's reasoning, and that of the foregoing federal decisions, and are not persuaded by defendant's arguments to the contrary.

## DISPOSITION

The judgment is modified by reducing defendant's conviction of arson of an inhabited structure (Pen. Code, § 451, subd. (b)) to arson of a structure (*id*., subd. (c)). As modified, the judgment is affirmed and the matter is remanded to the trial court with directions to resentence the defendant on the modified judgment as provided by law and, after resentencing, to issue an amended abstract of judgment.

                                                                                  _____/s/_____

                                                               HOCH, J.

We concur:

_____/s/_____
RAYE, P. J.

_____/s/_____
DUARTE, J.