Filed 11/30/23

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>JORDAN BUCKNER,<br><br>        Defendant and Appellant. | A162304<br><br>(Napa County<br>Super. Ct. No. 20CR001370) |

Defendant Jordan Buckner appeals a judgment convicting him of arson of an inhabited structure and sentencing him to three years in prison. He contends that: (1) there is no substantial evidence to support the jury's finding that the house was inhabited because the evidence did not show that he intended to continue living in the house after the fire; (2) the court erred by admitting at trial statements he made during a police interview that he argues were taken in violation of his *Miranda*[1] rights; and (3) the trial court improperly ordered him to pay restitution to his insurance company and the fire department.

We disagree with Buckner on the first two points but agree with him on the third. First, as we conclude in the published portion of the opinion, the law does not require the prosecution to prove that Buckner intended to

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II and III.

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*)

continue living in the house *after* the fire, and since Buckner was living in the house at the time of the fire, substantial evidence supports the jury's conclusion that the house was inhabited. Second, Buckner's statements to the police were properly admitted at trial because, under the totality of the circumstances, the interview during which he made them was not custodial. Third, the restitution order must be reversed because, as the Attorney General acknowledges, the insurance company and the fire department are not victims of Buckner's crime for purposes of restitution under Penal Code[2] section 1202.4. Accordingly, we reverse the restitution order, remand for a new restitution hearing, and otherwise affirm the judgment.

## BACKGROUND

Buckner was charged with a single count of arson of an inhabited structure. (§ 451, subd. (b).) Prior to trial, he moved to exclude statements he made during an interview with the arson investigator on the ground that the investigator violated his *Miranda* rights by continuing to question him after he invoked his right to counsel. The trial court denied his motion, finding that the interrogation was not custodial, and alternatively that his request for counsel was not clear and unambiguous.

The following evidence was presented at trial.

On November 30, 2019, at around 7:30 p.m., neighbors noticed a fire at Buckner's home and called the fire department. After the fire was extinguished, a firefighter determined that the fire started on a bed in the northwest bedroom of the home and was caused by an unknown open flame source that ignited gasoline vapors. Subsequent testing of cloth samples taken from the bed where the fire started confirmed the presence of gasoline residue.

---

[2] All statutory references are to the Penal Code.

Buckner lived alone at the time of the fire and no one was in the house when the firefighters arrived. Inside the home, arson investigators found a backpack containing several cellphones, a laptop computer, a vehicle pink slip, other financial documents, a resume, and two professional certificates. Buckner's car was parked in the garage. The investigator reported seeing a couch in the living room, a mattress with blankets and miscellaneous items in one bedroom, and a kid's bed, a mattress, chairs, and other furniture in the bedroom where the fire started.

Around 5:00 a.m. on the morning after the fire, Buckner returned to the house and identified himself as the owner. After fire personnel prohibited him from entering the house, he walked away. When he returned later that morning, he asked if he could collect some clothing from his house, but was told to stay outside for his safety and due to the ongoing investigation.

At that time, an arson investigator asked Buckner if he was willing to be interviewed at the police station. Buckner agreed, and once they arrived at the station, he told the investigator that his house was in foreclosure because he had recently lost his job. He claimed that he was out walking in a nearby nature reserve at the time of the fire and did not return to the property until after the fire department had arrived.

Buckner testified at trial that he was living at the house on November 30. He denied setting the fire and claimed that he was not home when the fire started. He believed that someone broke into his house and set it on fire. He testified that he stopped paying his mortgage and was "waiting for it to foreclose" because he did not want to live in the area anymore. On cross-examination, Buckner clarified that he was "waiting to get evicted."

Buckner's mortgage lender filed an insurance claim, but Buckner did not. The insurance adjuster determined that the damage would cost $151,757 to repair and that asbestos abetment would cost an additional $28,876. These amounts were paid jointly to Buckner and the lender.

The jury found Buckner guilty as charged.

On March 16, 2021, the court sentenced Buckner to three years in state prison. The court ordered restitution to Buckner's insurance company in the amount of $170,651.05 and to the mortgage lender and the fire department in amounts to be determined. On March 19, 2021, Buckner timely filed a notice of appeal.[3]

## DISCUSSION

### I. Burning of an Inhabited Structure

Section 451 punishes arson "that causes an inhabited structure or inhabited property to burn . . . ." (§ 451, subd. (b).) "Inhabited" is defined as "currently being used for dwelling purposes whether occupied or not." (§ 450, subd. (d).) The statute "requires current inhabitation, i.e., that the structure be inhabited at the present time," which is "the time the fire is set." (*People v. Vang* (2016) 1 Cal.App.5th 377, 386; see also *People v. Jones* (1988) 199 Cal.App.3d 543, 549 (*Jones*) [evidence must show that "someone had the present intent to use the house as a dwelling at the time of the fire"].) Buckner interprets this requirement to mean that the prosecution must prove that he intended to continue living in the house *after* the fire, "not just . . . prior to and at the time that the burning occurred." We disagree.

_____

[3] Buckner's motion to expand his notice of appeal to permit review of restitution hearings held on April 22 and May 3, 2022, is denied. The relevant order was made at the sentencing hearing on March 16, 2021. The trial court's subsequent refusal to modify that order does not preclude our review of the initial restitution order.

4

Buckner relies on cases in which a structure has been vacated at some point before the fire is set. The question in those cases is whether an unoccupied house is "inhabited"—i.e., whether it is "currently being used for dwelling purposes" notwithstanding that the residents previously left it. Courts have held that such a structure is "inhabited" if the residents, when they vacated it, intended to return and continue living there. So, for example, in *Jones, supra,* 199 Cal.App.3d 543, the defendant and his roommates were evicted from a house after the landlord obtained an unlawful detainer judgment. (*Id.* at p. 545.) The defendant came back the next day and burned the house down. (*Ibid.*) He was convicted of arson of an inhabited dwelling and argued on appeal that the house was not inhabited because the tenants had been evicted and neither new tenants nor the owner had moved in. (*Ibid.*) The court held that "the requirement the structure be 'currently used' for dwelling purposes requires the People to prove at least one of the evicted tenants intended to continue living in the house after the *eviction.*" (*Id.* at p. 548, italics added.) The court had no occasion to consider whether the prosecution had to prove that one of the tenants intended to continue living in the house after the *fire.*

Buckner focuses on a sentence in the portion of the court's opinion assessing the evidence: "Even if defendant did spend the night in the house, setting fire to a house contravenes an intent to use it for dwelling purposes." (*Jones, supra,* 199 Cal.App.3d. at p. 549.) That sentence, however, immediately followed observations that "there was no evidence anyone slept in the house after the eviction," and that the fact the defendant and others "were seen leaving the house at 8:30 or 9:00 a.m. does not support an inference any of them spent the night there." (*Ibid.*) " ' "It is axiomatic that language in a judicial opinion is to be understood in accordance with the facts

and issues before the court." ' " (*People v. Knoller* (2007) 41 Cal.4th 139, 154–155.) In *Jones*, the issue was whether the eviction established that the house was not inhabited, and the court held it did not unless the evidence also showed that the defendant (and other tenants) did not intend to return after being evicted. (*Jones*, at pp. 545–546.) In context, and as indicated by the sentences that precede it, the court's statement meant that the defendant's setting of the fire the next day was evidence that he did not intend to continue living in the house after he was evicted. It does not mean that arsonists who intend to destroy their current dwelling are not guilty of burning an inhabited structure.

Buckner also cites *Mason v. Superior Court* (2015) 242 Cal.App.4th 773, in which the defendant challenged the sufficiency of the evidence because the fire captain testified to the grand jury that the owner of the destroyed home had said only that he "had been to the house within the last couple of years." (*Id.* at p. 789.) Citing *Jones*, the court found sufficient evidence "that the owner intended to return" because the owner himself testified, " 'We had every intention of continuing to use it in the same way that we have been using it since it was built in 1976, which was every couple of weekends.' " (*Ibid.*) As in *Jones*, the question in *Mason* was whether the residents intended to return to the house notwithstanding having previously vacated it.

Buckner's opening brief additionally relies on two cases in which the resident of the house died before the defendant set fire to it. (See *People v. Vang, supra*, 1 Cal.App.5th 377, 382; *People v. Ramos* (1997) 52 Cal.App.4th 300, 302.) In both cases, the courts held that the deceased was not currently using the structure for dwelling purposes when the fire was set, and they cited *Jones* in observing that a person who has died cannot intend to return

6

or to continue living in the house.  (*Vang*, at p. 386; *Ramos*, at p. 302.)  But the point in both cases was that the house ceased to be inhabited at the time of the resident's death.  Neither case considered whether the prosecution must prove the resident's intent to continue to use the house for dwelling purposes after the fire.

In his reply brief, Buckner invokes *People v. Villalobos* (2006) 145 Cal.App.4th 310, 315–316, which involved charges of burglary and robbery that rely on an identically-worded definition of "inhabited" in section 459.  Unlike the other cases Buckner cites, the court did consider whether the prosecution must prove that the resident intended to continue using the structure for dwelling purposes after the crime.  But it concluded there is no such requirement.  The defendants there argued that a motel room is not "inhabited" when it is rented for only one night, because the occupant does not intend to return.  (*Id.* at p. 316.)  In disagreeing with the defendants' argument, the court explained that the phrase " '*intending to continue doing so in the future*,' " which appeared in an earlier opinion on which the defendants relied, had been taken out of context, and originated in cases in which "the issue is when a dwelling that was once inhabited becomes uninhabited for the purposes of the burglary and robbery statutes."  (*Id.* at pp. 319–320.)  The resident's intent to return matters if the resident has previously moved out, but where the victim "had not moved out of the motel room, temporarily or otherwise, her intent to continue using the room simply has no bearing on whether the room was inhabited at the time of the robbery."  (*Id.* at p. 320.)  Thus, the court concluded, "[i]f the person is using the structure as a habitation when the burglary or robbery occurs, his possible intent to abandon the habitation in the future does not alter its character as an inhabited dwelling."  (*Ibid*.)

7

Buckner does not argue that the word "inhabited" has a different meaning in the context of the arson statute, and under *Villalobos*, whether he intended to continue living at the house in the future is immaterial. The relevant question is whether he was living there when the fire was set. Buckner himself testified that he was living at the house on the day of the fire. The physical evidence was consistent with this testimony. His furniture, clothing, cell phones, a laptop computer, important documents, and car were in the home. Substantial evidence therefore supports the jury's conclusion that the house was inhabited at the time of the fire.

## II. Admissibility of Buckner's Statements

Buckner contends that the trial court erroneously admitted his statements to the arson investigator that he had lost his job, his home was in foreclosure, and he was out walking in the nature reserve at the time of the fire. He argues that the investigator should have stopped the interview as soon as he indicated that he would like to have a lawyer present. We do not reach the question whether Buckner made an unambiguous request for counsel that would have required termination of the interview, because that claim depends on a threshold showing that the interview was custodial. After reviewing the record, we conclude that Buckner was not in custody even though the arson investigator began the interview by reading Buckner his *Miranda* rights.

### A. Additional Factual Background

At the hearing on Buckner's motion to exclude his statements, the arson investigator testified that when he initially ran into Buckner at the property, he asked him if he would be willing to come to the police station for an interview. Buckner agreed and, because he did not have a working car of his own, he rode to the station in the front seat of the investigator's

8

unmarked police car. When they arrived at the station, the investigator took Buckner to an interview room in the secure area of the police station and closed the door. Buckner was not handcuffed at any time.

With his body camera operating, the investigator read Buckner his *Miranda* rights as follows: "Alright, uh . . . since we're at the police department and we're in um, the interview room here, uh, you're not under arrest or anything but I'm gonna read you your *Miranda* rights, ok? Um, you have the right to remain silent. Anything you say can and will be used against you in court. You have the right to consult with an attorney and have an attorney present during questioning. If you cannot afford an attorney, one can be provided to you before questioning at no cost." When asked whether he understood his rights, Buckner said "not really." He then added, "I think I'd like to have a lawyer present. I mean, you have me on camera." The investigator explained that was "just how we do . . . all our interviews" and asked, "So is that what you want? To have a lawyer present?" Buckner said "uh, I believe so." The police investigator replied, "Well, I mean, you tell me. It's totally up to you," then added, "But you understood . . . like those . . . cause you said you didn't understand the rights I read you. Did you need me to explain um part of it more?" Buckner replied, "no, I . . . go ahead . . . you can go ahead with your interview." The investigator confirmed it was "ok" to talk, reread Buckner his *Miranda* rights and then asked again, "Ok so, with those rights in mind, do you want to speak with me?" Buckner responded, "Yeah I'll speak with you." The investigator testified that although he did not tell Buckner that he was free to leave the station, in his mind he believed that he was. He testified that he spoke to Buckner in a non-aggressive tone throughout the interview. After telling the officer about his financial situation and where he was the day of

the fire, Buckner again indicated that he would like an attorney present. The investigator ended the interview at that time.

**B. Analysis**

Under *Miranda, supra*, 384 U.S. at page 444, "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." More specifically, "prosecutors may not admit a suspect's statements in their case-in-chief against the suspect-defendant unless (1) the defendant was advised that (a) "he has a right to remain silent," (b) anything he says "may be used as evidence against him," (c) "he has a right to the presence of an attorney," and (d) the defendant will be provided an attorney if he cannot afford one; (2) the defendant waived those rights, either expressly (by affirmatively indicating a waiver) or implicitly (by answering questions); and (3) prior to making the statements to be admitted, the defendant did not invoke either his right to remain silent or his *Miranda* right to an attorney." (*People v. Orozco* (2019) 32 Cal.App.5th 802, 811.)

To determine whether a trial court admitted a statement in violation of *Miranda, supra*, 384 U.S. 436, we independently review the application of law to facts. (*People v. Weaver* (2001) 26 Cal.4th 876, 918.) We generally accept the "trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence." (*People v. Cunningham* (2001) 25 Cal.4th 926, 992.) However, where "an interview is recorded, the facts surrounding the admission or confession are undisputed and [courts] may apply independent review." (*People v. Duff* (2014) 58 Cal.4th 527, 551.)

10

An officer's obligation to administer *Miranda* warnings attaches only when the person being questioned is in "custody." (*Stansbury v. California* (1994) 511 U.S. 318, 322; *People v. Moore* (2011) 51 Cal.4th 386, 394–395 (*Moore*).) "Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest. [Citations.] When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood his situation." (*Moore*, at pp. 394–395.) "Courts have identified factors that are relevant in determining whether the defendant was in custody during police questioning. [Citation.] 'No one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest.' [Citation.] The relevant factors include: '[1] whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; [2] whether the express purpose of the interview was to question the person as a witness or a suspect; [3] where the interview took place; [4] whether police informed the person that he or she was under arrest or in custody; [5] whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; [6] whether there were restrictions on the person's freedom of movement during the interview; [7] how long the interrogation lasted; [8] how many police officers participated; [9] whether they dominated and controlled the course of the interrogation; [10] whether they manifested a belief that the person was culpable and they had evidence to prove it; [11] whether the police were aggressive, confrontational, and/or accusatory; [12] whether the

police used interrogation techniques to pressure the suspect; and [13] whether the person was arrested at the end of the interrogation.' " (*People v. Saldana* (2018) 19 Cal.App.5th 432, 455.)

In *Moore, supra,* 51 Cal.4th at pages 402–403, the court considered whether a station-house interview was custodial for purposes of *Miranda.* In that case, the defendant was taken voluntarily to the police station to give a statement as a possible witness in a murder investigation. (*Id.* at pp. 397–398.) The interview was conducted in a secure room, but the door was propped open. (*Id.* at p. 398.) The defendant was interviewed by two officers. (*Ibid.*) The interview was audio- and videotaped. (*Ibid.*) The defendant was not handcuffed or otherwise restrained and he was expressly told that he was " 'not under arrest or anything,' " that he had been brought to the station only to give a statement, and that he was " 'free to go or whatever.' " (*Ibid.*) "The interview was fairly long—one hour 45 minutes—but not, as a whole, particularly intense or confrontational. . . . For a substantial period, . . . the questioning did not convey any suspicion of defendant or skepticism about his statements." (*Id.* at p. 402.) However, "[a]fter a while, . . . the detectives interjected some more accusatory and skeptical questions." (*Ibid.*) At some point in the interview the defendant asked to go home but his request was denied. (*Id.* at p. 403.) The court concluded that the interview "did not, in its entirety, constitute custodial interrogation." (*Id.* at p. 402.) It was not custodial "[a]t least until defendant first asked to be taken home and his request was not granted." (*Id.* at p. 403.) The court reasoned that "a reasonable person in defendant's circumstances would have believed, despite indications of police skepticism, that he was not under arrest and was free to terminate the interview and leave if he chose to do so." (*Ibid.*) The court reiterated that "*Miranda* warnings are not required 'simply because the

12

questioning takes place in the station house, or because the questioned person is one whom the police suspect.' [Citation.] While the nature of the police questioning is relevant to the custody question, police expressions of suspicion, with no other evidence of a restraint on the person's freedom of movement, are not necessarily sufficient to convert voluntary presence at an interview into custody." (*Ibid*.)

As in *Moore*, many of the circumstances surrounding Buckner's interview support the conclusion that it was not custodial. First, contrary to his argument, substantial evidence supports the trial court's finding that he went voluntarily to the police station. The officer asked him if he was willing to go to the station to make a statement and he was driven in the front seat of the police car. The fact that Buckner was prevented from entering his home before the interview was reasonable and not coercive given the ongoing investigation. Nothing suggests that the officer used this circumstance as leverage to obtain Buckner's statement. Once at the station, Buckner was not handcuffed, and although the interview room door was apparently closed, he was expressly told that he was not under arrest. Although the officer was investigating a suspected arson, Buckner does not claim that the officer's questions were accusatory or adversarial, and our review of the record persuades us that they were not. Unlike in *Moore*, the interview in this case only lasted "a few minutes," it was conducted by one officer, and Buckner was allowed to leave when he asked to consult with an attorney.

As Buckner argues, the most significant factual distinction between this case and *Moore* is that in this case Buckner was read his *Miranda* rights at the start of the interview. In *People v. Boyer* (1989) 48 Cal.3d 247, 272, disapproved on different point in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1, the court relied on the fact that the defendant had been read his

13

*Miranda* rights as one of many circumstances establishing that the defendant's station-house interrogation was custodial.  The court noted that the fact that "the police read defendant his *Miranda* rights at the station" was "a strong indication that they themselves considered the interrogation 'custodial.'"  (*Ibid*.)  Some federal courts have similarly concluded that, "[a]lthough giving a *Miranda* warning does not, in and of itself, convert an otherwise non-custodial interview into a custodial interrogation, it is a factor to be considered by the court."  (*United States v. Bautista* (10th Cir. 1998) 145 F.3d 1140, 1148; *Sprosty v. Buchler* (7th Cir. 1996) 79 F.3d 635, 642 [giving *Miranda* warnings to a suspect "in the context of a prolonged detention where there is persistent, accusatory questioning by several officers, . . . without actually telling [suspect] that he was not under arrest does provide some support for an inference that [the suspect] was in custody for purposes of *Miranda*"]; but see *Davis v. Allsbrooks* (4th Cir. 1985) 778 F.2d 168, 172 [to hold that giving *Miranda* warnings creates custody would "convert admirable precautionary measures . . . into an investigatory obstruction"]; *United States v. Lewis* (6th Cir. 1977) 556 F.2d 446, 449 [rejecting argument that "the very giving of *Miranda* rights helped produce a custodial interrogation" because "[t]he precaution of giving *Miranda* rights in what is thought could be a non-custodial interview should not be deterred by interpreting the giving of such rights as a restraint on the suspect, converting a non-custodial interview into a custodial interrogation for *Miranda* purposes"].)

We conclude that the giving of the *Miranda* advisement in this case does not establish that Buckner's interview was custodial.  Here, unlike in *People v. Boyer, supra*, 48 Cal.3d at page 272, when the officer read Buckner his *Miranda* rights, he also told Buckner that he was not under arrest and

explained that he was giving a *Miranda* advisement because the interview was taking place at the police station. As noted above, in *People v. Saldana, supra,* 19 Cal.App.5th at page 455, the court observed that the relevant circumstances include whether officers informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom. The *Miranda* warnings in this case "served to inform [defendant] that the officers could not and would not force him to answer their questions." (*United States v. Erving L.* (10th Cir. 1998) 147 F.3d 1240, 1247, fn. 5.) Buckner's ability to stop the interview approximately 15 minutes after it began reflects his awareness of his ability to terminate the interview and leave the police station.

On balance, the totality of the circumstances establish that the interrogation was not custodial. As such, *Miranda* and its progeny do not apply. (*Montejo v. Louisiana* (2009) 556 U.S. 778, 795 ["If the defendant is not in custody then [*Miranda*] do[es] not apply"]; *People v. Mickey* (1991) 54 Cal.3d 612, 648 ["Absent 'custodial interrogation,' *Miranda* simply does not come into play"]; see also *Bobby v. Dixon* (2011) 565 U.S. 23, 28, [a suspect cannot " 'invoke his *Miranda* rights anticipatorily, in a context other than "custodial interrogation" ' "].) It is therefore immaterial whether Buckner made an unambiguous request for counsel. We find no error in the admission of his statements at trial.

### III. Restitution

A court has a constitutionally mandated duty to order restitution to a victim who "has suffered economic loss as a result of the defendant's conduct." (§ 1202.4, subd. (f); Cal. Const., art. I, § 28, subd. (b)(13)(A).) Section 1202.4, subdivision (f), requires the court to "require that the

15

defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court. If the amount of loss cannot be ascertained at the time of sentencing, the restitution order shall include a provision that the amount shall be determined at the direction of the court." A business or governmental entity is a "victim" under section 1202.4 when the entity is "a direct victim of a crime." (§ 1202.4, subd. (k)(2).)

Here, the court ordered restitution to Buckner's insurance company in the amount of $170,651.05 and to the mortgage lender and the fire department in an amount to be determined subsequently at the direction of the court. Buckner contends that the trial court abused its discretion in ordering him to pay restitution to his insurance company and the fire department because neither entity was a direct victim of his crime.

Initially, we reject the Attorney General's contention that Buckner's failure to object to the order on this ground waives the issue on appeal. Buckner's argument that his insurance company and the fire department are not direct victims of his crimes under section 1202.4 is a purely legal issue that is not subject to the waiver rule. (See *People v. Percelle* (2005) 126 Cal.App.4th 164, 179 [argument that restitution was imposed in excess of court's statutory authority is a legal issue that is not subject to the waiver rule].)

Turning to the merits, the parties agree that the insurance company and the fire department are not entitled to restitution in this case because they are not direct victims of Buckner's crime. We agree. (See *People v. Martinez* (2005) 36 Cal.4th 384, 393–394 & fn. 2 [government agency responsible for cleaning up defendant's illegal crime lab was not direct victim of defendant's crime of attempting to manufacture methamphetamine,

16

disapproving *In re Brian N.* (2004) 120 Cal.App.4th 591, "to the extent it holds that a fire department that has incurred labor costs in fighting a fire on a vacant lot not owned by the department is a direct victim of the crime of unlawfully causing a fire"]; *People v. Birkett* (1999) 21 Cal.4th 226, 245 ["insurer did not become a 'direct victim' of crime, and thus entitled to restitution . . . by paying the crime-related losses of its insured under the terms of an insurance policy"].)

The parties disagree, however, as to the proper remedy. The Attorney General suggests that we should strike the court's order insofar as it orders restitution to the fire department but modify the order to substitute the mortgage lender in place of the insurance company. Buckner argues that the restitution order should be set aside entirely. We agree that the order must be reversed insofar as it orders restitution to the insurance company and the fire department and the matter remanded for a new restitution hearing.

Consistent with the statutory requirement, the court ordered restitution on behalf of the mortgage lender in an amount to be determined subsequently by the court. The prosecution, however, has not submitted any documentation in support of the mortgage lender's losses. (*People v. Baker* (2005) 126 Cal.App.4th 463, 467 [restitution order must have a " ' " 'factual and rational basis' " ' "]; *People v. Fulton* (2003) 109 Cal.App.4th 876, 886 ["a victim seeking restitution (or someone on his or her behalf) initiates the process by identifying the type of loss [citation] he or she has sustained and its monetary value"].) Although the insurance company's calculation of the cost to repair the damage caused by the fire might provide evidence of the amount of the mortgage lender's losses, the two amounts are not necessarily identical. (*People v. Bernal* (2002) 101 Cal.App.4th 155, 162 [amount recovered in settlement with defendant's insurer "need not mirror" amount of

restitution]; see also *People v. Nichols* (2017) 8 Cal.App.5th 330, 342 ["Victims are entitled to an amount of restitution so as to make them whole but not more than their actual losses arising out of the defendant's criminal conduct"].) Nor has Buckner been given the opportunity to contest the amount of restitution owed to the lender. (§ 1202.4, subd. (f)(1) ["The defendant has the right to a hearing before a judge to dispute the determination of the amount of restitution"].) Accordingly, the matter must be remanded for submission of a proper request for restitution and a hearing to resolve any disputes.

On remand, if Buckner is ordered to pay restitution to the mortgage lender, he is entitled to an offset for the sums paid by his insurer "to the extent that those payments are for items of loss included in the restitution order." (*People v. Bernal, supra,* 101 Cal.App.4th at p. 168; *Barickman v. Mercury Casualty Co.* (2016) 2 Cal.App.5th 508, 518 ["Although payments received by a crime victim from the victim's insurance company . . . for economic losses suffered as a result of the defendant's criminal conduct cannot reduce the amount of restitution the defendant owes, the defendant is entitled to an offset to the extent those payments are from his or her own insurance for items of loss included in the restitution order"].)

Accordingly, we reverse the order of restitution to the fire department and the insurance company and remand for further proceedings.

## DISPOSITION

The restitution order is reversed insofar as it orders restitution to the fire department and Buckner's insurance company and the matter is remanded for a new restitution hearing. The judgment is otherwise affirmed.


GOLDMAN, J.

WE CONCUR:

BROWN, P. J.
STREETER, J.

| | |
|---|---|
| Trial Court: | Napa County Superior Court |
| Trial Judge: | Honorable Elia Ortiz |
| Counsel for Defendant and Appellant: | Kevin J. Lindsley, under appointment by the Court of Appeal<br>FIRST DISTRICT APPELLATE PROJECT, Stephanie Clarke |
| Counsel for Plaintiff and Respondent: | Rob Bonta<br>Attorney General of California<br>Lance E. Winters<br>Chief Assistant Attorney General<br>Jeffrey M. Laurence<br>Senior Assistant Attorney General<br>Masha A. Dabiza<br>Deputy Attorney General |